Kirt Douglas WAINWRIGHT *v.* STATE of Arkansas

CR 89-79                                    790 S.W.2d 420

Supreme Court of Arkansas
Opinion delivered May 29, 1990

376

*Edward F. Cochran*; and *Malaby & Shumaker*, by: *David Malaby*, for appellant.

*Steve Clark*, Att'y Gen., by: *Olan W. Reeves*, Asst. Att'y Gen., and *John D. Harris*, Asst. Att'y Gen., for appellee.

TOM GLAZE, Justice. Appellant was convicted of capital murder for the robbery and shooting of Barbara Smith, a convenience store clerk in Prescott. He was sentenced to death by lethal injection. On appeal, appellant raises sixteen points for reversal, but we find none of the points have merit.

We first consider appellant's contention that the trial court erred in denying his motion for directed verdict. *Harris* v. *State*, 284 Ark. 247, 681 S.W.2d 334 (1984). In doing so, we note the state was required to prove (1) the appellant, acting alone or with one or more persons, committed or attempted to commit the crime of robbery; (2) in the course of and in furtherance of that crime or in the immediate flight therefrom, the appellant or a person acting with him, caused the death of Smith under circumstances manifesting an extreme indifference to the value of human life. *See* Ark. Code Ann. § 5-10-101(a) (Supp. 1989). Here, robbery is the underlying felony, so the state had to prove the appellant, with the purpose of committing a theft or resisting apprehension immediately thereafter, employed or threatened to employ physical force upon another. Ark. Code Ann. § 5-12-102 (1987). In reviewing the sufficiency of the evidence, this court views the testimony in the light most favorable to the appellee, and affirms if there is any substantial evidence in support of the verdict. *Williams* v. *State*, 289 Ark. 69, 709 S.W.2d 80 (1986).

Although no one saw appellant shoot Smith, witnesses did see the appellant run from the Best Stop convenience store immediately after Smith was shot. Octavia Hardamon, who

personally knew appellant, said that she saw appellant leave the store with a pistol in his hand. Pauline Henagen testified that, when she entered the store, she saw Ms. Hardamon. She also saw a tall, young black man, wearing red flowered shorts, leave the store, and while she never identified appellant's face with that of the man who left the store, Henagen did identify the shorts the appellant was wearing when he was apprehended as the ones she saw on the man at the store. Sam Gatlin was outside the store when he saw appellant run from the store and enter a pink Cadillac.

Another witness, Patrick Flenory, age fourteen years, knew the appellant, and recognized him running out of the store and getting in a pink Cadillac, which afterwards was driven in a manner that caused it to almost run over Flenory. Elnora Hopson, whom appellant lived with, stated that, on the day of the crime and at near the time the shooting occurred, appellant entered her house, went into the bedroom, got his clothes and came out "pretty quick." Hopson's grandson later that same evening found checks stamped "Best Stop" in the Hopson house. Best Stop's owner testified that $329.00 in checks and $374.00 in cash were missing.

On the night of the shooting, Hope police officers stopped a pink Cadillac, which contained appellant and two other black males. Appellant was in the back seat of the car, and was wearing the flowered shorts, which were later identified by Henagen. The officers found a .22 caliber pistol, money and a maroon bag in the car's back seat. The pistol had some empty chambers, and although the state could not prove for sure that the gun found in the car fired the shot that fatally wounded Smith, the state's expert witness did say that the fatal round was fired from a pistol just like the one found in possession of appellant.

The foregoing evidence, while circumstantial, clearly supports the state's charge that the appellant killed Barbara Smith in the course or furtherance of a robbery. At this point, we mention that the appellant raised the defense that he did not commit the homicidal act and, in this vein, he mentions that no gunshot residue was found on him nor was blood found on his clothes. *See* Ark. Code Ann. § 5-10-101(b). An alleged accomplice, Dennis Leeper, on the other hand, had gunshot residue on

his hand. Other evidence, however, indicated appellant may have had time to wash his hands after the shooting when he stopped to pick up his clothes, and that the residue on Leeper's hand could have been caused merely by his having handled the gun after it had been fired. After the state met its burden in proving the elements of capital murder, appellant simply failed to meet his burden of proving his affirmative defense. *See Fairchild* v. *State,* 284 Ark. 289, 681 S.W.2d 380 (1984).

■ Next, we review appellant's claim that the trial court erred in failing to grant a change of venue. Appellant offered three witnesses in support of his request for a new venue. Two witnesses were associated with area newspapers, and they related the various articles published regarding Smith's murder. However, both witnesses opined that the appellant could obtain a fair trial in Nevada County. It was also shown that most of the publicity surrounding this murder ended about two months prior to the date of trial. While the third witness expressed doubts that the appellant could receive a fair trial in the county, she indicated she could be fair if she was selected as a juror. Most of the jurors admitted to some exposure to pretrial publicity, but on voir dire they all announced they could give the appellant a fair trial. Appellant had the burden of showing that a fair trial is not likely to be had in the county, and the trial court's decision on the issue will be upheld unless it is shown the court abused its discretion. *Gardner* v. *State,* 296 Ark. 41, 754 S.W.2d 518 (1988). Again, appellant failed to meet his burden, and the trial court's ruling must stand.

■ Citing *Ake* v. *Oklahoma,* 470 U.S. 68 (1985), appellant argues error resulted from the trial court's denial of funds for him to hire a psychiatric expert. In *Parker* v. *State,* 292 Ark. 421, 731 S.W.2d 756 (1987), we held that the defendant's right to an examination under *Ake* is adequately protected by the examination at the state hospital, an institution which has no part in the prosecution of criminals.

The state hospital's evaluation of appellant showed he was competent, but suffered from cocaine abuse. Nonetheless, the trial court informed appellant that it would allow funds for further psychiatric evaluation if he could show it was necessary. Douglas Stevens, a clinical psychologist who subsequently ex-

amined the appellant, opined that while the state hospital properly assessed appellant's capacity to stand trial, the hospital did not explore areas that impacted on mitigating circumstances. He said that appellant had an attention deficit disorder with hyperactivity as a child and that this disorder developed into associated behavioral problems, such as problems in conforming his behavior to the requirements of the law. Appellant proffered other testimony by Stevens indicating that Stevens, if paid, would have done more background work which might have resulted in raising the issue of appellant's temporary insanity at the time of the crime.

In sum, the record reflects the appellant was provided $840.00 to pay Stevens for his evaluation even though appellant had been evaluated by the state hospital. Stevens, at trial, conceded that he was not saying that the appellant could not have kept from killing the victim. He added that the appellant was capable of helping his attorney, and he knew the difference between right and wrong.

We cannot say the trial court erred in refusing to furnish the appellant additional funds under these circumstances. We conclude this point by noting the appellant benefited from the funds that the trial court awarded by using Stevens' testimony in the penalty phase of the trial as to appellant's childhood behavioral problems and their effect on the appellant now. Furthermore, Stevens testified that he believed the appellant could benefit from the structured life of a prison.

We next review appellant's claim regarding four statements he gave the police after his arrest on the night of July 29, 1988. His fourth statement was the only inculpatory one. He argues this statement (and the second one) introduced by the state should have been suppressed. In his fourth statement, the appellant admitted that he had been seen leaving the convenience store, and that, if he did anything, he did it himself and the others did not know about what happened. He concluded the statement by saying, "You got me man."

In considering this argument, we must make an independent determination of the voluntariness of a confession, but do not set aside the jury's finding unless it is clearly against the preponderance of the evidence. *Jackson* v. *State*, 284 Ark. 478,

683 S.W.2d 606 (1985). Some of the factors we have considered in determining whether a statement was voluntarily made include the youth of the accused, lack of education, low intelligence, lack of advice of constitutional rights, length of detention, repeated and prolonged questioning, and the use of physical punishment. *Id.* We have stated that conflicts in the testimony as to voluntariness are for the trial court to resolve. *Id.*

The appellant was read his rights upon his arrest, and before giving his first statement, he initialed and signed the rights form at about 10:08 p.m. on July 29, 1988. On July 30, 1988, at 1:00 a.m., he was shown the previously executed rights form again when he gave his second nonincriminating statement, which read much like his first. Appellant's third statement was more detailed but still was nonincriminating like his first two. Before giving this statement, he executed a second rights form at 5:45 p.m. on July 31.

At 8:45 p.m. on July 31, he volunteered his fourth statement, which was the incriminating one. While the appellant did not execute a new rights form, an officer asked him if he remembered what his rights were, and the appellant said yes. Our court, in *Cope* v. *State*, 292 Ark. 391, 730 S.W.2d 242 (1987), held there is no requirement that the Miranda warnings, when properly given, must be repeated each time the defendant is questioned. Here, the record indicates the appellant was properly advised of his constitutional rights and that his statements were given after a relatively short period of detention and without undue or prolonged questioning.

Furthermore, on the voluntariness issue, the record shows the appellant was twenty-two years old, had a tenth grade education, and could read and write. According to the police officers' testimony, the appellant appeared to be sober and coherent at the questioning sessions. The police officers testified that he was not coerced or threatened and that each time the appellant spoke he did so voluntarily, without asking for a lawyer. The appellant, himself, initiated the fourth statement. He asked to speak to Lt. Duvall and voluntarily gave his statement. The appellant was allowed to review his statements, and he crossed out several lines in the fourth statement. Although he did speak to the officers four times, there is no indication that these sessions

lasted for a long time. Accordingly, we hold the trial court should be sustained on this issue.

Appellant raises two juror issues, the first concerning his charge that, after he had exercised all of his peremptory challenges, he should have been granted a motion to strike venireman Larry Gilleylen for cause. Gilleylen stated that he had read about the murder in the newspapers. He initially said that he felt the appellant was guilty unless he was shown evidence that would sway him the other way. However,·when the state explained that he would be instructed to give the appellant the presumption of innocence and that the state must prove his guilt, Gilleylen responded that he would give appellant the presumption of innocence and could give him a fair trial. Appellant also complains that Gilleylen was biased because he thought appellant should get the severest penalty if the evidence was sufficient. However, Gilleylen concluded that, under certain circumstances, life without parole would be an appropriate punishment. He stated that he would consider both penalties and wait for the facts "to tell him which one to apply."

Jurors are presumed unbiased, and the burden of proving actual bias is on the party challenging the juror. *Gardner*, 296 Ark. 41, 754 S.W.2d 518. The question of a juror's qualifications rests within the sound discretion of the trial court, and the proper test is whether the prospective juror can lay aside his impression or opinion and render a verdict based upon the evidence in court. *Swindler* v. *State*, 264 Ark. 107, 569 S.W.2d 120 (1978). Here, the trial court found Gilleylen could reach a fair verdict based upon the evidence, and we are unable to say the trial court erred in doing so.

Appellant's other juror issue involves his contention that his mistrial motion should have been granted because a systematic exclusion of blacks existed in violation of the principle set out in *Batson* v. *Kentucky*, 476 U.S. 79 (1986). In *Batson*, the Supreme Court held that a criminal defendant has the right to be tried by a jury whose members are selected pursuant to nondiscriminatory criteria. It further held that the Equal Protection Clause guarantees the defendant that the state will not exclude members of his race from the jury venue on account of race or on the false assumption that members of his race as a group are not

qualified to serve as jurors. A defendant, under the *Batson* decision, must establish a prima facie case of purposeful discrimination, and if such a showing is made, the burden then shifts to the state to give a neutral explanation for the questioned challenges. *Smith* v. *State*, 294 Ark. 357, 742 S.W.2d 936 (1988). The prima facie case may be made by showing one of the following: (1) the totality of the relevant factors gives rise to an inference of discriminatory purpose; (2) the total or seriously disproportionate exclusion of Negroes from the jury venires; or (3) a pattern of strikes, or questions and statements by a prosecuting attorney during voir dire. *Ward* v. *State*, 293 Ark. 88, 733 S.W.2d 728 (1987).

Here, appellant is a black man, who was accused of killing a white woman. The jury seated for trial had one black juror. Nine black veniremen were on the panel at the time individual voir dire began, but the trial court excused seven of them because of their beliefs about the death penalty. Of the remaining panelists, Margaret Jones was seated and Gladys Blakely was the only black excluded by peremptory challenge. The state struck her because of her expressed views on the death penalty. Blakely, expressing her religious views, said that she did not believe in the death penalty. After questioning by the defense, she later stated that it was possible that she could consider the death penalty and that she did not oppose it. From these facts, we conclude the appellant failed to establish a prima facie case, but even if he had done so, the state clearly offered a neutral explanation for challenging Mrs. Blakely.

Appellant also argues the trial court should have granted a mistrial because the state seated the victim's family on the front row of the courtroom. Before the jury was seated, the prosecutor remarked to the judge that a group of students were on the front row and that certain family members of the victim should have those seats so they could hear. Appellant objected, and the court took no action on the request. Sometime later, an associate of the prosecutor apparently got the students to move and the family members sat on the front row before the jury. Appellant moved for a mistrial. The court concluded that it had not ordered the prosecutor not to move the family; however, the court then told the prosecutor not to sit them in any particular place in the courtroom and to tell them they may sit wherever they could find

empty seats.

██ Appellant cites the case of *Booth* v. *Maryland*, 482 U.S. 496 (1987), but here, unlike in *Booth*, nothing in the record reflects the victim's family members acted emotionally during the trial. In fact, we find nothing that even indicates the jury was aware the people, occupying the front row, were family members of the victim. The appellant showed no prejudice that may have resulted from the seating of the family members, so he has no ground for complaint. *Webster* v. *State*, 284 Ark. 206, 680 S.W.2d 906 (1984).

██ Citing A.R.Cr.P. Rule 17.1(a)(ii), appellant next urges that the trial court erred in denying the appellant's mistrial motion based upon the nondisclosure of two oral statements allegedly made by the appellant. As to one statement offered through officer Lt. Duvall, who testified concerning a trace metal test given appellant, the trial court was confronted with a swearing match. The purported statement attributed to appellant was that Duvall "would not get anything off his hands." Appellant's counsel said that he was never furnished this statement. The prosecutor answered that counsel for appellant knew about the statement at least two weeks before trial and that the parties discussed the statement the day before the appellant's objection was made. It is the trial court's function to resolve such conflicts, and the court determined that the state disclosed the statement as soon as the prosecutor learned about it. We hold the trial court did not abuse its discretion by denying the appellant's motion for mistrial. Furthermore, appellant showed no prejudice since appellant's statement that Duvall would not find anything by the test could also mean the appellant knew he was innocent.

The second oral statement was offered by the state during the punishment phase of the trial. The state asserts it learned of this statement only after the appellant testified. Robert Johnson, a trustee at the county jail on a work-release program, approached the prosecutor and told him the appellant had lied when he claimed he signed the statement, implicating himself of the murder, only after he was beaten by the police. Johnson told the prosecutor that he had been posted to guard Leeper, an alleged accomplice, and Johnson claimed that, when appellant was taken to give his final, incriminating statement, appellant looked

Leeper in the eyes and said, "Don't worry I'm fixing to send you home."

After learning of Johnson's story, the prosecutor offered Johnson as a rebuttal witness. The trial court allowed Johnson to testify stating the prosecutor could not have known what the appellant was going to say during his testimony and that the state's proof was proper rebuttal testimony. The trial court was correct.

In *Parker* v. *State*, 268 Ark. 441, 597 S.W.2d 586 (1980), we held that the state was not required to furnish the defense counsel the names of witnesses he was going to call in rebuttal. In so holding, we stated that there is no way a prosecuting attorney can anticipate whom he will call in rebuttal until the defense presents its case. Likewise here the state did not know of the statement until Johnson apprised the state of it after the appellant testified. Nor did the state know what it needed to prove until the appellant told his story. The trial court did not abuse its discretion by admitting this oral statement into evidence.

Appellant contends the trial court erred in allowing the prosecutor to cross-examine him about certain forged checks. Under A.R.E. Rule 608(b), specific instances of conduct of a witness can be used to attack his credibility if it is probative to truthfulness or untruthfulness. This court, in *David* v. *State*, 286 Ark. 205, 691 S.W.2d 133 (1985), stated that most forms of forgery in the second degree are probative of truthfulness or untruthfulness. Although the appellant testified that he had been convicted of forgery and rape, he stated that he had been straightening his life out in the past few years. In rebuttal, the state wanted to show the appellant had committed an untruthful act, forgery, just ten days before the murder. Under these circumstances, the state's cross-examination was proper.

In his next point, appellant challenges the trial court's admission into evidence another statement attributed to him by Johnson, the jail trustee, and Chief Deputy Tom Birdsong. During the penalty phase of trial, appellant testified that he had never said that he had killed the victim. On rebuttal, Johnson and Birdsong related that appellant got angry because his jail cell had been searched, and he had to be restrained. During the scuffle or

altercation, appellant said, "I killed the white honky woman and I wish it had been your mother [wife]."[1] Appellant argues appellant's purported remarks were involuntary and should have been excluded because he had not recently been given Miranda warnings. As previously discussed, appellant had been properly given his rights on prior occasions and as stated in *Cope*, those rights need not be given repeatedly. *Cope*, 292 Ark. 391, 730 S.W.2d 242. Nonetheless, the trial court here concluded the appellant's statements were spontaneous and not the result of interrogation. In this respect, we have held that spontaneous, voluntary and unsolicited statements, made when an accused, although in custody, is not being interrogated, are admissible. *Beed* v. *State*, 271 Ark. 526, 609 S.W.2d 898 (1980). Thus, we hold the trial court was correct in permitting Johnson's and Birdsong's testimony regarding the spontaneous remarks made by appellant.

In his next point, appellant relies on our recent case of *Moore* v. *State*, 299 Ark. 532, 773 S.W.2d 834 (1989), where we held it was improper for the court to permit policemen, who had testified against the defendant, to sit within the rail during the closing argument. Here, the appellant moved for a mistrial because two police officers stood near him during his testimony. The record shows that the trial court had the two police officers present to provide security throughout the trial, and that the officers were no closer to the appellant than they were during the rest of the trial. Unlike in *Moore*, here the officers never testified, and the court stated that a conscious effort was made to ensure the officers never blocked the jury's view of the appellant. The trial judge had the discretion to take security measures, and the measures taken in this case in no way resulted in prejudice to the appellant.

In appellant's next issue, he argues he should have been allowed to strike one of the aggravating circumstances because it was not supported by any evidence. He is clearly wrong. Here, the jury found that the murder was committed for the purpose of avoiding or preventing appellant's arrest. The

---

[1] Birdsong testified that after Johnson left appellant's cell, appellant made the remark but used the term "wife".

state's evidence supported this assertion. Best Stop's manager, Ms. St. Clair, testified that, on or about a few days before the murder, the appellant had tried to cash a two-party check, and she had told the victim, Barbara Smith, not to cash the check. Smith rejected a second attempt by appellant, as well. Obviously, the appellant had prior dealings with the victim, and knowing his name, Smith could have identified him as having committed the robbery. If there is any evidence of the aggravating circumstance, however slight, the matter should be submitted to the jury. *Miller* v. *State*, 269 Ark. 341, 605 S.W.2d 430 (1980). The state's evidence here was clearly sufficient to allow the jury to consider this aggravating circumstance.

Appellant, citing *Caldwell* v. *Mississippi*, 472 U.S. 320 (1985), questions certain remarks made by the prosecutor in closing argument. Those intermittent remarks summarized are the following:

> You are not sentencing this man to death, you did not make his bed. There is no better example for young people than people to say Kirt Wainwright got on cocaine. He went and murdered that woman, and he died for it. That's a good example. That's the kind of example that the State of Arkansas wants to set for them. If this isn't a case for death penalty in Nevada County, Arkansas, there never will be one.

In *Caldwell*, the Supreme Court vacated a death sentence because it was based on a determination made by a sentencer who was led to believe that the responsibility for determining the appropriateness of the defendant's death sentence rests not with the jury but with the appellate court that later reviews the case. In that case, the prosecutor told the jury not to view itself as determining whether the defendant would die, because a death sentence would be reviewed for correctness by the state supreme court.

First of all, *Caldwell* is distinguishable from the instant case because Arkansas provides no automatic appeal from a death penalty case and the prosecutor's remarks in no way suggested that the jury's decision would be reviewed for correctness. Instead, the prosecutor's comment made here merely reflected that the appellant was the one who robbed and murdered the

victim, not the jurors. In fact, the prosecutor, in his own words during his closing argument, said "[Appellant] put a bullet in Barbara, not you . . . he is the one who got himself here."

Appellant also complains of the closing remarks by the prosecutor where the prosecutor stated that this case is an appropriate case for the death penalty and that giving the appellant such a sentence will set a good example. The trial court has discretion to control closing argument and is in a better position to determine the possibility of prejudice by observing the argument first hand. *Williams* v. *State*, 294 Ark. 345, 742 S.W.2d 932 (1988). Here, the appellant failed to show the prosecutor's remarks were prejudicial and that his argument denied appellant a fair trial. *See Henderson* v. *State*, 281 Ark. 406, 664 S.W.2d 451 (1984).

Appellant next asserts the trial court incorrectly denied his motion for judgment notwithstanding the verdict, which was based upon his argument that the jury made inconsistent findings on a mitigating circumstance. On one form the jury unanimously found the appellant did not resist when arrested and on another form it found this same mitigating factor did not exist. Although the jury may have been inconsistent on this factor, it was clear in unanimously finding that three aggravating circumstances existed at the time appellant committed the murder. On the other hand, even giving the appellant the benefit of the mitigating circumstance discussed above, the jury only determined that two mitigating circumstances existed. Upon individual polling, each juror stated that he or she had voted for the death penalty. Obviously, the jury found the aggravating circumstances outweighed those mitigating factors, and the trial court was correct in so holding.

Finally, appellant raises two other arguments, but for reasons given hereafter, we need not discuss them. Those arguments are as follows: (1) appellant contends Arkansas' capital murder statute is unconstitutional because it overlaps its first degree murder statute and (2) appellant argues the trial court should have excluded pecuniary gain as an aggravating circumstance because of "double counting." We have rejected these arguments in earlier cases. We decided the first issue in *Sellers* v. *State*, 300 Ark. 280, 778 S.W.2d 603 (1989); *Cromwell* v. *State*,

269 Ark. 104, 598 S.W.2d 733 (1980), and the second argument was resolved in *O'Rourke* v. *State*, 295 Ark. 57, 746 S.W.2d 52 (1988). Nevertheless, appellant now requests that we overrule those cases—a request we choose to decline.

As required by Ark. Sup. Ct. R. 11(f), we have reviewed the entire record for other reversible error and find none. Therefore, we affirm the verdict and sentence of the jury.