```
                    _____

                    No. 94-3525EA
                    _____

Kirt Douglas Wainwright,          *
                                  *
              Appellant,          *
                                  *
     v.                           *
                                  *
A. L. Lockhart, Director,         *
Arkansas Department of            *
Correction,                       *
                                  *
              Appellee.           *

         _____              Appeals from the United States
                                    District Court for the Eastern
         No. 94-3528EA              District of Arkansas.
         _____

Kirt Douglas Wainwright,          *
                                  *
              Appellee,           *
                                  *
     v.                           *
                                  *
A. L. Lockhart, Director,         *
Arkansas Department of            *
Correction,                       *
                                  *
              Appellant.          *
                    _____

          Submitted:  September 11, 1995

            Filed:  April 8, 1996
                    _____
```

Before FAGG, Circuit Judge, HENLEY, Senior Circuit Judge, and
      MAGILL, Circuit Judge.
                    _____

FAGG, Circuit Judge.

     Kirt Douglas Wainwright, an Arkansas death row inmate, appeals the
district court's partial denial of his habeas petition.  We

affirm.  The State of Arkansas cross-appeals the partial grant of habeas relief.  We reverse.

Wainwright was convicted of killing Barbara Smith, an attendant at the Best Stop convenience store in Prescott, Arkansas.  Ms. Smith was shot during a robbery on July 29, 1988.  Although no one saw the murder, witnesses saw Wainwright run out of the store after the robbery and jump into a pink Cadillac.  A short time later, police saw the pink Cadillac and pulled it over.  Andrew Woods was driving the car and Dennis Leeper was riding in the front seat.  Wainwright was in the back seat with a Best Stop money bag containing cash and a gun.  The State charged all three men with capital murder.

At Wainwright's trial, the State presented evidence that Wainwright went into the Best Stop alone and committed the robbery and murder while Leeper and Woods waited in the car.  Wainwright argued Leeper was the triggerman.  After hearing the evidence, an Arkansas jury convicted Wainwright of capital felony murder.  Ark. Code Ann. § 5-10-101(a)(1) (Michie 1987).  At the conclusion of the penalty phase, the trial court submitted special verdict forms to the jury.  On these forms, the jury unanimously found three aggravating circumstances existed at the time of the murder: Wainwright had previously committed another felony involving a threat of violence to another person, the murder was committed to avoid or prevent arrest, and the murder was committed for pecuniary gain.  The jury also unanimously found two mitigating circumstances:  Wainwright had no history of homicide before the murder of Ms. Smith, and Wainwright did not resist when arrested for murdering her.  The jury then unanimously found the aggravating circumstances outweighed any mitigating circumstances and justified a sentence of death.

The Arkansas Supreme Court affirmed on direct appeal.  Wainwright v. State, 790 S.W.2d 420 (Ark. 1990) (Wainwright I),

-2-

cert. denied, 499 U.S. 913 (1991). State postconviction relief was denied, Wainwright v. State, 823 S.W.2d 449 (Ark. 1992) (per curiam) (Wainwright II), and Wainwright filed this habeas petition in federal district court. After conducting evidentiary hearings, the district court denied Wainwright relief on all except one of his claims: that the State violated Wainwright's First and Fourteenth Amendment rights by questioning him about a "Blood handbook" during the penalty phase. Wainwright v. Norris, 872 F. Supp. 574 (E.D. Ark. 1994) (Wainwright III). The district court ordered the State to conduct a new sentencing trial or to convert Wainwright's sentence to life imprisonment without parole. Id. at 620. Wainwright now appeals the denial of his other claims for relief, and the State cross-appeals the partial grant.

Relying on Lewis v. Erickson, 946 F.2d 1361 (8th Cir. 1991), Wainwright first contends witness Octavia Hardamon Gamble's partial recantation of her trial testimony is newly discovered evidence warranting habeas relief because the testimony would probably change the result on retrial. During Wainwright's trial, Gamble testified she was inside the Best Stop near the time of the murder and saw Wainwright, whom she had known for several years, leave the store with a gun in his hand. On cross-examination, Wainwright's attorneys accused Gamble of having an affair with Wainwright and suggested she had reason to spite him because he had told Gamble's husband about the affair, but Gamble denied any romantic relationship with Wainwright or reason to fabricate her testimony. Nevertheless, Sheila Butler, a friend of Gamble's, testified that Gamble had romantic encounters with Wainwright. At the habeas evidentiary hearing, Gamble admitted that she had been romantically involved with Wainwright and had lied at trial because she was newly married, embarrassed, and ashamed. Gamble reaffirmed that she saw Wainwright leave the Best Stop with a gun in his hand, however. See Wainwright III, 872 F. Supp. at 598-601.

In our view, evidence of Gamble's untruthfulness about the

affair would not likely produce an acquittal on retrial, Lewis, 946 F.2d at 1362, or a life sentence at the penalty phase. At the habeas hearing, Gamble reaffirmed the material part of her trial testimony: she saw Wainwright run out of the Best Stop with a gun. Butler's trial testimony already contradicted Gamble's trial testimony about her relationship with Wainwright. Most importantly, even without Gamble's testimony that she saw Wainwright inside the Best Stop with a gun, substantial circumstantial evidence shows Wainwright committed the robbery and murder himself. See Wainwright I, 790 S.W.2d at 422; Wainwright III, 872 F. Supp. at 580-81. Several witnesses who arrived just after the murder took place testified they saw one black man run out of the Best Stop. A witness testified the man was wearing red and white flowered shorts, and another testified he jumped into a pink Cadillac that sped away. A young man who knew Wainwright through family connections testified he was walking by the Best Stop at the time of the murder and saw Wainwright run out of the store. The young man was sure the fleeing man was Kirt Wainwright because he saw Wainwright's face. Moments later, the young man saw a pink Cadillac speed by him. The young man testified he saw Wainwright in the back seat and two other people in the car. When police stopped the pink Cadillac soon after the murder, Leeper and Woods were in the front, and Wainwright was in the back seat with the Best Stop money bag and a gun. Ballistics tests revealed the gun could have been the one used to kill Ms. Smith. Wainwright was wearing red and white flowered shorts when apprehended and the shorts were later identified as the ones the witness had seen on the man running from inside the Best Stop. Neither Leeper nor Woods was wearing red shorts. Given this substantial circumstantial evidence against Wainwright, we cannot say the jury would probably have reached a different conclusion in either the guilt or penalty phase had Gamble testified truthfully about her relationship with Wainwright. Thus, Wainwright is not entitled to habeas relief on this ground.

Wainwright next asserts his trial counsel was ineffective in failing to offer the testimony of Dr. Irwin Stone, a ballistics expert. According to Wainwright, Stone's testimony would have shown Leeper, rather than Wainwright, was the triggerman. Evidence at trial showed Ms. Smith's killer had the gun in his left hand when he fired the lethal shot. About three hours after the murder, gunpowder residue tests were performed on Wainwright, Leeper, and Woods. No gunpowder residue was found on Woods or Wainwright, who is left-handed. Leeper, who is right-handed, tested positive for gunpowder residue on his left hand, however, and there was more residue on the back of his hand than on the front.

To explain these results, the State argued Wainwright had rubbed the gunpowder residue off his hands sometime after he shot Ms. Smith, and Leeper had handled the gun sometime after the murder. See Wainwright III, 872 F. Supp. at 585-86. The State's ballistics expert, Gary Lawrence, testified at trial that a person could get gunpowder residue on his or her hands by firing a weapon, handling a weapon that has been fired, or being near a weapon when it is fired. Lawrence also testified that vigorous activity or washing with water can remove the residue. At the habeas hearing, Dr. Stone testified that the most likely way to get gunpowder residue on the back of the hand is by firing a weapon and it is unlikely that handling a gun would put residue there. Thus, Dr. Stone's testimony cast some doubt on the State's theory. Nevertheless, Dr. Stone confirmed that gunshot residue can be easily removed by washing or rubbing, and stated that even normal activity may remove it within three hours.

To establish ineffective assistance of trial counsel, Wainwright must show the decision not to call Dr. Stone was professionally deficient, and a reasonable probability that the result of the guilt phase or penalty phase would have been different had Dr. Stone testified. Strickland v. Washington, 466 U.S. 668, 687, 694 (1984). At the habeas hearing, Wainwright's

-5-

trial attorney testified he had interviewed Dr. Stone before the trial but decided Stone's testimony was unnecessary because it was consistent with Lawrence's testimony. The district court concluded the attorney's decision not to call Dr. Stone was professionally deficient. Wainwright III, 872 F. Supp. at 586. Nevertheless, the district court was not convinced a different result in the guilt or penalty phase was reasonably probable if Dr. Stone had testified at trial. Id. at 586-87. We agree. In light of the circumstantial evidence indicating Wainwright was the lone robber and murderer, supra at 4, we do not believe the jury would have found otherwise had Dr. Stone testified that firing a gun was the most likely way for Leeper to get gunpowder residue on the back of his hand. In sum, our confidence in the outcomes of the guilt and penalty phases is not undermined by any error in failing to call Dr. Stone.

Wainwright next argues the State's reliance on the aggravating circumstance that he committed the murder to avoid or prevent arrest, Ark. Code Ann. § 5-4-604(5), violates the Eighth and Fourteenth Amendments for several reasons. Wainwright contends the circumstance does not genuinely narrow the class of persons eligible for the death penalty as required by Lowenfield v. Phelps, 484 U.S. 231, 244 (1988). We have already rejected this challenge to Arkansas's death penalty scheme. Ruiz v. Norris, 71 F.3d 1404, 1408 (8th Cir. 1995); Perry v. Lockhart, 871 F.2d 1384, 1393 (8th Cir.), cert. denied, 493 U.S. 959 (1989). Arkansas's capital felony-murder statute sufficiently narrows the class of murderers eligible for the death penalty by specifying only a subgroup of murders as capital ones. Ruiz, 71 F.3d at 1408; see Ark. Code Ann. § 5-10-101.

Wainwright also contends the circumstance that he committed the murder to avoid or prevent arrest is vague and overbroad, both facially and as applied in his case. We disagree. The statutory language defining the circumstance is specific enough to guide the jury and avoid arbitrary and capricious imposition of the death

-6-

penalty.  Whitmore v. Lockhart, 8 F.3d 614, 624 (8th Cir. 1993); see Walton v. Arizona, 497 U.S. 639, 652-53 (1990); Williams v. Clarke, 40 F.3d 1529, 1537-38 (8th Cir. 1994), cert. denied, 115 S. Ct. 1397 (1995).  Wainwright next argues the circumstance impermissibly elevates the required mental state at the penalty phase and thus produced an inconsistent jury verdict.  According to Wainwright, the jury's guilt-phase finding that in the course of committing robbery, Wainwright "cause[d] the death of any person under circumstances manifesting extreme indifference to the value of human life" conflicts with its penalty-phase finding of the aggravating circumstance that the murder was committed purposely to avoid arrest.  These findings are not inconsistent.  Any higher intent requirement at the penalty phase simply supports the aggravating circumstance and further narrows the class of murderers eligible for the death penalty.

Wainwright also argues that even if the aggravating circumstance is constitutional, the evidence is insufficient to support it.  The aggravating circumstance of committing the murder to avoid arrest applies when a robber "makes the cold-blooded calculation that by annihilating his victim he thereby eradicates an eyewitness to his crime."  Pickens v. State, 551 S.W.2d 212, 215 (Ark. 1977) (en banc), cert. denied, 435 U.S. 909 (1978).  On direct appeal, the Arkansas Supreme Court found the evidence sufficient to support this aggravating circumstance.  Wainwright I, 790 S.W.2d at 427.  Ms. Smith was shot once in the top of the head at point-blank range.  Further, the Best Stop's manager testified Ms. Smith knew Wainwright's name and could probably identify him because she had rejected a check he had tried to cash on two occasions.  We conclude the evidence was sufficient to convince a reasonable juror beyond a reasonable doubt that Wainwright murdered Ms. Smith to avoid arrest.  See Smith v. Armontrout, 888 F.2d 530, 538 (8th Cir. 1989).

Wainwright next contends his death sentence violates the

Eighth and Fourteenth Amendments because of the jury's "inconsistent findings" about the mitigating circumstance that he did not resist when arrested for the murder. On one special verdict form, the jury indicated it had unanimously found the lack-of-resistance circumstance and one other mitigating circumstance existed. On another form, the jury indicated it had unanimously found the lack-of-resistance circumstance did not exist. According to Wainwright, these contrary statements show the jury was confused about the lack-of-resistance circumstance. Whether or not the jury found Wainwright did not resist arrest, the jury clearly considered the circumstance one way or the other. Cf. Woodard v. Sargent, 806 F.2d 153, 157-58 (8th Cir. 1986) (failure to submit applicable mitigating circumstance to jury for consideration prejudiced defendant). The jury then specifically found the three "aggravating circumstances outweigh[ed] beyond a reasonable doubt all mitigating circumstances," whether the jury found one or two mitigating circumstances. Because this is not arbitrary or capricious, there is no Constitutional violation. See Williams, 40 F.3d at 1537-38.

Wainwright also asserts the State's reliance on the aggravating circumstance of murder committed for pecuniary gain, Ark. Code Ann. § 5-4-604(6), violated the Eighth and Fourteenth Amendments. Wainwright argues the circumstance repeats an element of the underlying robbery and thus fails to narrow the class of murderers eligible for the death penalty. We rejected this challenge to Arkansas's death penalty scheme in Perry, 871 F.2d at 1392-93. Wainwright asserts our decision in Perry is wrong. We recently reaffirmed that duplication of an element of capital robbery-murder by one or more aggravating circumstances does not render Arkansas's death penalty scheme unconstitutional. Ruiz, 71 F.3d at 1407-08. As we explained in Ruiz, no panel of this court can reconsider the Perry decision. Id.

Wainwright next asserts the seating of the victim's family

near the jury during the trial violated his due process rights. Before the jury entered the courtroom, a crime victims' assistant with the prosecutor's office asked some people seated in the front row to move so the victim's family could sit there. The defense objected and the trial court stated the prosecutor should not tell people where to sit and the victim's family could sit wherever they could find seats. Although the victim's family sat in the front row near the jury during the entire trial, the victim's family did not cry, shout, cause a disturbance, or identify themselves to the jury. The state court found there was no evidence that the jury knew the people in the front row were the victim's family members. Wainwright I, 790 S.W.2d at 425. In this habeas proceeding, we must presume the state finding is correct. 28 U.S.C. § 2254(d) (1988). In light of the finding, Wainwright cannot show the seating arrangement prejudiced him. Because any error was harmless, Wainwright is not entitled to habeas relief on this ground. See Brecht v. Abrahamson, 113 S. Ct. 1710, 1722 (1993).

Wainwright also asserts the presence and actions of security officers denied his right to a fair trial. During the guilt phase, two or three police officers sat in chairs directly behind the defense table. When Wainwright testified during the penalty phase, the sheriff and a police officer accompanied Wainwright to the witness stand, stood next to him while he testified, then escorted him back to his chair. The Arkansas Supreme Court found these security measures did not prejudice Wainwright. Wainwright I, 790 S.W.2d at 427. The district court agreed. Wainwright III, 872 F. Supp. at 607-08.

State judges have broad discretion to take security measures in state courthouses. Hellum v. Warden, 28 F.3d 903, 907-09 (8th Cir. 1994). To succeed on a claim that state-court security measures denied the right to a fair trial, a federal habeas petitioner must show the measures were either actually or inherently prejudicial. Holbrook v. Flynn, 475 U.S. 560, 572

(1986).  Wainwright has not shown actual prejudice.  To decide whether the security measures were inherently prejudicial, we consider whether they presented "`an unacceptable risk . . . of impermissible factors coming into play.'"  Id. at 570 (quoting Estelle v. Williams, 425 U.S. 501, 505 (1976)).

Here, the officers' act of escorting Wainwright to the witness stand during the penalty phase may have suggested he was likely to flee or harm someone, but Wainwright was a convicted capital murderer at that point.  The officers did not obstruct the jury's view of Wainwright, and were no closer to Wainwright during his testimony than during the rest of the trial.  We think the jury would view the officers' presence and actions as ordinary and normal concern for the safety and order of the proceedings.  See id. at 571.  In sum, we cannot say the scene presented to the jury was "so inherently prejudicial as to pose an unacceptable threat to [Wainwright's] right to a fair trial."  Id. at 572 (no prejudice where four uniformed, armed state troopers sat in first row of spectators' section behind six defendants); see United States v. Darden, 70 F.3d 1507, 1533-34 (8th Cir. 1995) (no prejudice to defendants being tried for extraordinarily violent criminal enterprise by use of unarmed officers in courtroom, metal detectors outside courtroom, jury sequestration and transportation by marshals, armed guards along street, helicopter surveillance, and snipers on courthouse roof); Hopkinson v. Shillinger, 866 F.2d 1185, 1218 (10th Cir. 1989) (no prejudice where guards used magnetometer to check everyone entering courtroom, prosecutor's bodyguards wore bulletproof vests and visibly carried guns, and guards audibly cocked guns when lights went out in courtroom during trial), cert. denied, 497 U.S. 1010 (1990).

Wainwright also asserts that even if we reject each claimed error individually, their cumulative effect deprived him of a fair trial.  In support of the cumulative error doctrine, Wainwright cites Harris v. Housewright, 697 F.2d 202 (8th Cir. 1982)

(cumulative effect of eleven mistakes by trial counsel amounted to deficient performance). Harris is no longer good law in light of the Supreme Court's decision in Strickland v. Washington, however. Girtman v. Lockhart, 942 F.2d 468, 475 (8th Cir. 1991); see United States v. Stewart, 20 F.3d 911, 917-18 (8th Cir. 1994). Errors that are not unconstitutional individually cannot be added together to create a constitutional violation. Stewart, 20 F.3d at 917-18. Neither cumulative effect of trial errors nor cumulative effect of attorney errors are grounds for habeas relief. Id.; Wharton-El v. Nix, 38 F.3d 372, 375 (8th Cir. 1994), cert. denied, 115 S. Ct. 1126 (1995); Griffin v. Delo, 33 F.3d 895, 903-04 (8th Cir. 1994), cert. denied, 115 S. Ct. 1981 (1995).

In its cross appeal, the State contends the district court incorrectly concluded the State's cross-examination of Wainwright about a "Blood handbook" and "the Bloods" violated his rights under the First and Fourteenth Amendments. See Wainwright III, 872 F. Supp. at 610-19. During the penalty phase, Wainwright testified that he is a Baptist, but had studied other religions. During cross-examination, the prosecutor showed Wainwright a booklet and asked him whether he had ever seen it. Id. at 612. Wainwright identified the booklet as Islamic material that belonged to him. The prosecutor then asked, "[I]s this what you refer to [as] the Blood handbook?" Id. at 613. Wainwright responded, "No, that's some [Moorish] Science Temple of America [material] . . . [from] a book called 101." The State next asked, "What is the Bloods?" and Wainwright said, "That means black. Blood means black." See Dictionary of Contemporary Slang 46 (1990) (defining "blood" as "a term of endearment or address used by black males to fellow males, a shortening of `blood brother'"). The State then moved for admission of the booklet, and the defense objected on the ground of relevance. After a discussion, apparently off the record, the trial court decided the booklet was not relevant since it did not reflect Wainwright's religious beliefs. Wainwright III, 872 F. Supp. at 613-14.

Evidence at the habeas hearing showed the booklet the State sought to admit is a handwritten copy of an Islamic religious booklet, "Koran Questions for Moorish Children." The text consists of 101 questions and answers about the Islamic faith. Because of the way the questions and answers are phrased ("Who made you? Allah.") and because Wainwright had copied the booklet in his own handwriting, the prosecutor believed the booklet contained Wainwright's own answers to the questions and thus reflected Wainwright's personal beliefs. The cover of Wainwright's copy of the booklet had a hand-drawn picture of a dagger dripping a dark substance into a puddle. "Blood" was written in large letters next to the dagger. See id. at 621 (reproduction of cover). The prosecutor mistakenly believed the booklet tied Wainwright to the Bloods street gang, based on the prosecutor's very strained interpretation of the booklet's text, see id. at 610, as well as his personal belief that the Bloods gang is part of the Islamic church, see id. at 616. At the habeas hearing, the district court asked the prosecutor whether the booklet's cover and the State's questioning about the "Blood handbook" and "the Bloods" led the jury to believe Wainwright was a member of the Bloods street gang. The prosecutor responded, "At the time I questioned Mr. Wainwright about this booklet, I felt in my heart that he was a member of the Bloods and that's what I was trying to get out to challenge his testimony and other evidence that he was a Christian." Id. at 618.

The district court concluded the prosecutor fed on "gang hysteria" in the community at the time and bought into it himself. Id. at 619. The district court held the State's cross-examination did not serve any proper rebuttal purpose and tended strongly to link Wainwright to a street gang and generate a fear of gangs in the jury. Id. The district court was convinced the prosecutor's questions and display of the booklet's cover made Wainwright appear more dangerous and led the jury to believe Wainwright was part of a criminal enterprise larger than a local convenience store murder. Id. The district court decided the jury would have imposed a

sentence of life without parole absent these prejudicial circumstances. Id. The district court concluded the cross-examination was improper and violated Wainwright's First and Fourteenth Amendment rights. Id.

Although the prosecutor did not ask Wainwright directly about gang membership, the prosecutor's word choice in asking about the booklet suggests the prosecutor was setting the stage to elicit testimony about gangs rather than religion. The prosecutor admitted as much at the habeas hearing. A defendant's membership in a gang cannot be raised as bad character evidence in the penalty phase of a capital proceeding when the evidence is not relevant to the rebuttal of any specific mitigating evidence. Dawson v. Delaware, 112 S. Ct. 1093, 1098-99 (1992); O'Neal v. Delo, 44 F.3d 655, 661 (8th Cir.), cert. denied, 116 S. Ct. 129 (1995). Here, gang membership was not relevant to rebut any of Wainwright's mitigating evidence or for any other purpose. There was no credible, admissible evidence that Wainwright's crime was gang related, that Wainwright belonged to any gang, or that any gang membership would impeach Wainwright's testimony about his religious beliefs. Like the district court, we conclude the prosecutor's questions "did not serve any proper rebuttal purpose." Wainwright III, 872 F. Supp. at 619.

Nevertheless, we disagree with the district court's conclusion that the questioning led the jury to believe it was dealing with a street gang. This conclusion is based on nothing more than unfounded speculation. The prosecutor's bigoted views and improper motive in questioning Wainwright about the booklet were not communicated to the jury. Although some jury members had read pretrial newspaper articles about Wainwright and some articles had erroneously reported Wainwright was a member of the Bloods street gang, "gangs" were not mentioned during voir dire or the trial. The jury heard the prosecutor use the term "blood," the proper name for a gang, in two questions, but Wainwright gave reasonable

-13-

responses unrelated to gangs and explained another meaning for the term. Further, the booklet was never admitted, and the trial court instructed the jury it should disregard "[a]ny argument, statements, or remarks of attorneys having no basis in the evidence."  The jury saw the booklet's cover with the word "blood," but in light of Wainwright's testimony about the booklet and the meaning of the term, we cannot say the jury would the connect the booklet to a notorious street gang.  In addition, neither side referred to the booklet in its closing argument, and Wainwright testified he did not subscribe to the beliefs in the booklet.  In the context of the entire proceeding, we cannot say the two improper questions and display of the booklet's cover fatally infected the penalty phase and rendered it fundamentally unfair.  <u>Anderson v. Goeke</u>, 44 F.3d 675, 679 (8th Cir. 1995).

We thus reverse the district court's grant of Wainwright's habeas petition on the "Bloods" issue, and affirm the district court's denial of the rest of Wainwright's petition.

HENLEY, Senior Circuit Judge, concurring <u>dubitante</u>

I concur in the well-written opinion of the panel, although I have reservations about one aspect of our decision.

I agree fully with the panel's handling of the issues raised by appellant Wainwright in his appeal.  Judge Eisele gave all of Wainwright's claims a very thorough airing and I am satisfied that he did not err in rejecting them.

I am troubled, however, by our decision to reverse  on the one issue -- the prosecutor's attempts to link Wainwright to gang membership not supported by any evidence -- as to which he granted habeas relief.  Judge Eisele, a very well-qualified and experienced trial judge, conducted a searching inquiry as to all of Wainwright's claims of error.  He heard testimony and had an

opportunity to evaluate the credibility of the witnesses first hand. Judge Eisele then wrote a 96-page opinion explaining in detail his reasoning for denying most of the claims but granting Wainwright a new sentencing hearing because of the prosecutor's improper references to gangs. His determination that the prosecutor's questions tainted the jury is one that I believe we ordinarily should respect. Moreover, the record is clear that the prosecutor was intentionally trying to inject the gang issue into the case and as both Judge Eisele and this court have found, this was improper. Such prosecutorial misbehavior I am reluctant to accept.

I have nonetheless decided to concur, with reservations, because the evidence against Wainwright was great and I cannot say, on balance, that the sentencing proceeding was fundamentally unfair.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.