Andrew R. ENGRAM *v.* STATE of Arkansas

CR 99-928                                    200 S.W.3d 367

Supreme Court of Arkansas
Opinion delivered December 16, 2004

[Rehearing denied January 20, 2005.]

*Bruce D. Eddy*; and *Montgomery, Adams & Wyatt, PLC,* by: *Dale E. Adams,* for petitioner.

*Mike Beebe,* Att'y Gen., by: *Jeffrey A. Weber,* Ass't Att'y Gen., for respondent.

TOM GLAZE, Justice. Petitioner Andrew Engram has filed a motion to recall the mandate and reopen his case. Engram was charged in the June 10, 1997, capital murder and rape of Laura White, a security guard working at Sears in North Little Rock. A jury convicted him on both counts on January 28, 1999, and sentenced him to death. His conviction and sentence were affirmed by this court on May 4, 2000. *See Engram v. State,* 341 Ark. 196, 15 S.W.3d 678 (2000). Engram then petitioned to the United States Supreme Court for a writ of certiorari, which the Court denied, *see Engram v. Arkansas,* 531 U.S. 1081 (2001); this court's mandate issued on January 12, 2001. On January 22, 2001, an attorney was appointed to represent Engram in postconviction proceedings, but, at a hearing before the circuit court, the attorney opined that there was nothing that merited Rule 37 relief. Engram then, on January 9, 2002, filed a petition for a writ of habeas corpus in the United States District Court for the Eastern District of Arkansas.

On April 18, 2003, Engram requested leave from the federal court to file an amended habeas corpus petition in order to raise additional grounds for relief, including a claim that he is mentally retarded and that his execution is barred under the Supreme Court's holding in *Atkins v. Virginia,* 536 U.S. 304 (2002). The federal district court granted Engram's motion to amend, but also raised *sua sponte* the question of whether Engram had presented his mental retardation claim in state court. After briefing by both Engram and the State, the federal court determined that Engram "did not present the federal constitutional dimensions of his *Atkins* claim to the state courts." Further, the federal court disagreed with the State's contention that Engram was procedurally barred from raising the mental retardation claim, ruling that there was "no question that the legal basis for [Engram's] *Atkins* claim was

unavailable to him during the state proceedings." Citing *Robbins v. State*, 353 Ark. 556, 114 S.W.3d 217 (2003), the federal district court concluded that "a substantial possibility exists that the Arkansas Supreme Court will recall the mandate in this case to consider [Engram's] *Atkins* claim." Thus, the court directed Engram to move to dismiss his amended petition without prejudice, and granted him leave to file a second amended petition that would relate back to his original, timely-filed petition.

Engram filed a motion to dismiss his amended petition, and the federal court granted his motion on October 7, 2003. Following entry of the federal court's order, Engram filed in this court a "Motion to Recall the Mandate and Reopen the Case and Brief in Support," on November 5, 2003. Our court directed that Engram's motion be submitted as a case, and a briefing schedule was established.

The most recent case in which this court has been asked to recall its mandate and reopen the case under similar circumstances was *Robbins v. State*, 353 Ark. 556, 114 S.W.3d 217 (2003). In that death-penalty case, Robbins asked this court to recall its mandate in order to address an error alleged to have occurred in the jury's completion of the sentencing verdict forms. In agreeing that the mandate should be recalled and the case reopened, the *Robbins* court noted that it was doing so for three reasons: 1) a decision had been cited to the court that was legally on all fours with the issue presented by Robbins; 2) the federal district court had dismissed Robbins's federal *habeas corpus* petition because that issue had not been addressed in state court; and 3) it was "a death case where heightened scrutiny is required." *Robbins*, 353 Ark. at 564. However, the *Robbins* court expressed its belief that its holding was "*sui generis* . . . [and] one of a kind, *not to be repeated*." *Id*. at 564-65 (emphasis added).

Engram contends that this court should recall its mandate and reopen his case based on the fact that, in 2002, the Supreme Court decided the case of *Atkins v. Virginia, supra*, wherein the Court held that the execution of mentally retarded individuals violates the Eighth Amendment's prohibition on cruel and unusual punishment. The *Atkins* Court noted that the practice of executing the mentally retarded had "become truly unusual, and it is fair to say that a national consensus has developed against it." *Atkins*, 536 U.S. at 316. In addition, the Court held that, given the diminished reasoning capacity of those with mental retardation, neither the retributive nor the deterrent purposes of the death penalty would

be served by executing the mentally retarded: "Unless the imposition of the death penalty on a mentally retarded person measurably contributes to one or both of these goals, it is nothing more than the purposeless and needless imposition of pain and suffering, and hence an unconstitutional punishment." *Id.* at 319 (quotations and citation omitted).

Although the *Atkins* decision came down after Engram's conviction and after the mandate issued in his case, the rule announced in *Atkins* is retroactive, according to the Supreme Court's reasoning set out in *Penry v. Lynaugh*, 492 U.S. 302 (1989). In *Penry*, the Court held that, when a new rule places a certain class of individuals beyond the State's power to punish, "the Constitution itself deprives the State of the power to impose a certain penalty," and the new rule should be applied retroactively. *Penry*, 492 U.S. at 330. Thus, although the *Penry* Court concluded that executing the mentally retarded was not constitutionally prohibited, it noted that, if a case in the future were to reach that conclusion, the prohibition should be applied retroactively and would apply to defendants on collateral review. *Id.*

In the present case, Engram argues that this court should read *Atkins*, as applied retroactively under the reasoning of *Penry*, in such a way that would permit reopening his case in order for him to raise and address the issue of his alleged mental retardation. Engram concedes that sentencing, this court's mandate, and the time for postconviction remedies are all long past. Nevertheless, Engram argues that this court can reopen his case under *Robbins*, because the three factors set out in *Robbins* have been met, as follows: 1) *Atkins* is on all fours with his case; 2) the federal court dismissed his *habeas* petition because the mental retardation issue has not yet been addressed by the state courts; and 3) this is a death case requiring heightened scrutiny.

However, *Robbins* is significantly distinguishable from Engram's case. The purpose of recalling the mandate and reopening the case in *Robbins* was in order to correct an error in the appellate process. For clarity, we briefly address the facts and history of the *Robbins* case at this stage. First, after Robbins was convicted, he waived his right to direct appeal, and this court subsequently affirmed the trial court's determination that Robbins was competent to make such a waiver. *State v. Robbins*, 335 Ark. 380, 985 S.W.2d 293 (1998) (*per curiam*) (*Robbins I*). Next, we further held that Robbins properly waived his right to seek Rule 37 postconviction relief. *State v. Robbins*, 336 Ark. 377, 985 S.W.2d 296

(1999) (*per curiam*) (*Robbins II*). However, Robbins's mother filed a next-friend petition asking this court to recall the mandate and re-examine Robbins's case; we granted her motion, recalled the mandate, stayed the execution, and ordered briefing on the issues raised by Robbins's mother. *State v. Robbins*, 337 Ark. 227, 987 S.W.2d 709 (1999) (*per curiam*) (*Robbins III*).

After considering the arguments raised as a result of that briefing, this court held that it was the court's duty to conduct an independent examination of the record to determine whether prejudicial error occurred under Ark. Sup. Ct. R. 4-3(h), whether any *Wicks* violations occurred during trial, and whether "fundamental safeguards" were in place during the trial. *State v. Robbins*, 339 Ark. 379, 5 S.W.3d 51 (*Robbins IV*). In order to accomplish this task, this court appointed *amicus* counsel to review the record and assist this court in its review, which counsel did.

In *Robbins v. State*, 342 Ark. 262, 27 S.W.3d 419 (2000) (*Robbins V*), this court held that no Rule 4-3(h) errors, *Wicks* errors, or errors implicating "other fundamental safeguards" occurred during the trial. This court affirmed Robbins's capital murder conviction and death sentence and dissolved the stay of execution. Following *Robbins V*, Robbins began, for the first time, to contest his death sentence, and he engaged legal counsel to pursue *habeas corpus* relief in federal district court. Robbins argued in the subsequent federal proceeding on his *habeas corpus* petition that an inconsistency in the jury's verdict forms violated his constitutional rights under this court's decision in *Willett v. State*, 322 Ark. 613, 911 S.W.2d 937 (1995). The State responded that Robbins had exhausted his state remedies by not pursuing a petition for rehearing and that the mandate in the case had issued, foreclosing additional review. The federal district court dismissed Robbins's habeas corpus petition without prejudice on the basis that Robbins had not exhausted his state remedies. Specifically, the federal district court noted that state courts had not examined Robbins's inconsistency-in-the-verdict-forms argument under *Willett v. State, supra*, and that he could "pursue his state remedies, if any."

Following dismissal of the federal *habeas corpus* matter, Robbins filed a petition to reopen his case in this court, arguing that this court's holding in *Robbins IV* required that the court reopen the case, and that a "fundamental error," a violation of Robbins's constitutional rights under *Willett v. State, supra*, occurred in his case. This court ultimately decided to recall the mandate because

of the "extraordinary circumstances" — i.e., a mistake was made in *Robbins V,* in that an issue was overlooked that would have been reversible error. Thus, the *Robbins* case hinged on the fact that an error was made *during this court's review,* and the recall of the mandate was intended to give *this court* an opportunity to address an issue that it should have addressed before. And as noted above, the *Robbins* court stressed that it considered the case "to be one of a kind, not to be repeated." 353 Ark. at 564-55.

▪ Engram's case differs from *Robbins.* For example, unlike *Robbins,* Engram is not asking this court to review an error alleged to have been made by this court during the course of its appellate review; instead, he is asking us to reopen his case so the trial court can address a matter that was never raised during trial. In *State v. Earl,* 336 Ark. 271, 984 S.W.2d 442 (1999) (*Earl II*), this court denied a motion to recall the mandate in similar circumstances. In that case, Earl asked this court to recall the mandate that issued after this court's opinion in *State v. Earl,* 333 Ark. 489, 970 S.W.2d 789 (1998) (*Earl I*), wherein this court held that a search was proper under Ark. R. Crim. P. 5.5. Subsequent to *Earl I,* the United States Supreme Court held unconstitutional an Iowa search-and-seizure statute that was similar to our Rule 5.5. *See Knowles v. Iowa,* 525 U.S. 113 (1998). In *Earl II,* Earl asked this court to recall its mandate on the basis of the Supreme Court's decision in *Knowles,* but this court declined to do so, stating that Earl "never timely challenged Rule 5.5's constitutionality at his hearing below or on appeal, and he did so only after the [Supreme Court] case was decided and after our court's mandate was issued." *Earl II,* 336 Ark. at 272.

▪ Engram's situation is more like *Earl* than *Robbins.* Despite Engram's arguments that he did not have the tools to raise a mental-retardation argument *vis-a-vis* the issue of execution at the trial level, Engram could have availed himself of Ark. Code Ann. § 5-4-618(b) (Repl. 1997), which explicitly provides that "[n]o defendant with mental retardation at the time of committing capital murder shall be sentenced to death."[1] As this court has

---

[1] At oral argument, counsel for Engram asserted that, despite the existence of § 5-4-618 at the time of his trial, he has never had the opportunity to present this argument as an Eighth Amendment claim. Counsel stated that "we [only now] realize under *Atkins* that an individual has that Eighth Amendment right. The whole thing is [that] the State is banned

previously held in *Rankin v. State*, 329 Ark. 379, 948 S.W.2d 397 (1997), "a defendant who wishes to invoke this provision must do so by written motion prior to trial. § 5-4-618(d)(1). If such motion is filed, the trial court must determine prior to trial whether the defendant is in fact mentally retarded." *Rankin*. 329 Ark. at 390 (citing § 5-4-618(d)(2)). Here, Engram simply did not file such a motion, nor did he request a court ruling on the issue of his mental retardation. In fact, a hearing was conducted on Engram's competency on March 19, 1998, and Engram offered no evidence at that hearing showing he was mentally retarded. As described below, forensic psychologist Dr. John Anderson testified on behalf of the State; Engram, however, put on no evidence regarding his mental status, although it was his burden to prove mental retardation. *See* § 5-4-618(c). Consequently, the trial court had no duty to rule on this issue.

At that hearing, Dr. Anderson testified that he conducted a forensic psychological examination of Engram, and administered the Kaufman Brief Intelligence Test in order to determine whether Engram was mentally retarded. Dr. Anderson stated that Engram scored an 81 on the composite results, 82 on the vocabulary, and 83 on the non-verbal scores. Applying a "confidence interval" of plus-or-minus five points, Dr. Anderson testified that Engram's "true score, or a score if he were administered this test a repeated number of times and you could control for learning and fatigue and that sort of thing, it would likely fall between the scores of 76 and 86." Dr. Anderson stated that *this score did not indicate mental retardation, and his opinion was that Engram was not mentally retarded.*

---

from executing the mentally retarded." However, under § 5-4-618, the State is barred from executing the mentally retarded; as noted above, the statute explicitly provides that "[n]o defendant with mental retardation at the time of committing capital murder shall be sentenced to death." *See* § 5-4-618(b). Further, the statute prohibits even the "death qualification" of the jury when the trial court determines that the defendant is mentally retarded. *See* § 5-4-618(d)(2)(B). Simply put, Engram offers no explanation why his Eighth Amendment argument — i.e., that the Eighth Amendment prohibits the execution of the mentally retarded — is not resolved by the application of our statute, *which prohibits the execution of the mentally retarded.* As the State noted at oral argument, under *Atkins*, the Eighth Amendment is satisfied when a state has in place a procedure that allows defendants to raise and be heard on the issue of their alleged mental retardation. Arkansas has such a procedure in § 5-4-618.

On cross-examination, Dr. Anderson agreed that, given the margin of error, Engram's IQ score could be as low as 76, which would be in the borderline range of general abilities, or in the area between mental retardation and average functioning. Upon questioning by the court, Dr. Anderson said that a score of 76 to 86 would be in the "low average" range, and that any score above 78 or 80 "would be, I guess, what most people think of as a normal score." According to Dr. Anderson, the mean IQ score is 100, and anything between 80 and 120 would be considered "normal."

At the conclusion of the competency portion of the hearing, the State asked that Engram be found competent, and the court complied. However, neither the defense nor the State asked for a ruling on the question of whether Engram was mentally retarded, and the trial court did not make such a ruling. It is sufficient to point out that this court has held that, where a defendant has an intelligent quotient which is above that 65 quotient prescribed by law, he is not entitled to the rebuttable presumption of mental retardation under the statute. *See Reams v. State*, 322 Ark. 336, 909 S.W.2d 324 (1995). This may well be the reason Engram failed to raise the mental retardation defense. *See id.*

As in *Earl II*, the issue on which Engram asks this court to recall the mandate is an issue which could have been resolved by the trial court, if only Engram had presented evidence bearing on this retardation issue and had asked for the trial court's ruling. We agree with the State's contention that a mental retardation claim cannot be raised at just any time in a defendant's proceedings. At oral argument, there was a suggestion that Engram's mental retardation claim could be considered as falling within one of the so-called *Wicks* exceptions, wherein this court may consider an argument raised for the first time on appeal when the trial court failed to bring to the jury's attention a matter essential to its consideration of the death penalty itself. *See Wicks v. State*, 270 Ark. 781, 785, 606 S.W.2d 366, 369 (1980). However, as described above, testimony presented to the trial court indicated that the lowest Engram's IQ score could be was 76. As already noted, Arkansas' statute creates a rebuttable presumption of mental retardation at an IQ of 65. *See* § 5-4-618(a)(2). Therefore, because Engram could not have availed himself of this presumption, there

was no duty on the trial court's part to raise, *sua sponte*, the issue of whether Engram was not eligible for the death penalty.[2]

This is simply not a case like *Robbins*, where the alleged error was an error in this court's own review of the case on appeal, and this court was asked to reopen the case to address its own error. Because *Robbins* was so strictly limited to its facts, this court made it clear that it would not expand the nature of cases in which it will recall a mandate it has already issued. Here, since it was Engram's burden to do so, he should have obtained a ruling on his mental retardation issue from the trial court before his trial ever started.

Instead, Engram never pursued the mental retardation issue, likely for the reason that there was no evidence offered to support such a defense. After all, Dr. Anderson testified that Engram's IQ was between 76 and 86. The General Assembly has set the threshold for presuming mental retardation exists at 65. Although Engram argues briefly that this figure is too low (and therefore does not comport with *Atkins*), the establishment of that presumption is a legislative determination.[3] Further, even if we were to rewrite the statute and declare that the presumptive IQ score indicating mental retardation is 70-75, Engram would still not fall within that range. He had a tested IQ that, at its lowest, was 76. Therefore, even applying the more expansive 70-75 score utilized in *Atkins*, Engram still would not have qualified as being mentally retarded.

The fundamental problem with Engram's argument, however, is simply that this is an argument that should have been made to the trial court.[4] As in *Earl II*, he did not raise it, and the fact that the Supreme Court has subsequently spoken on the constitutionality of the issue does not change the fact that he could — and

---

[2] In addition, even to the extent that *Wicks* allows certain arguments to be raised for the first time on appeal, we note that the present stage of these proceedings hardly constitute "the first time on appeal." We are now past the trial, the appeal, the postconviction proceedings, and part of the federal *habeas* process.

[3] We note that *Atkins* does not declare that the Constitution requires states to set a threshold for mental retardation of 70 or 75. Instead, *Atkins* merely pointed out in a footnote that current psychological diagnostic materials "typically consider[ ]" an IQ between 70 and 75 or lower to be "the cutoff IQ score for the intellectual function prong of the mental retardation definition[.]" *Atkins*, 536 U.S. at 309, fn.5.

[4] One of the dissenting opinions asserts that the burden was on the trial court to rule on the issue of Engram's mental retardation. However, § 5-4-618(d)(1) explicitly provides that "[a] defendant on trial for capital murder shall raise the special sentencing provision of mental retardation *by motion prior to trial*." (Emphasis added.) No such motion appears in the

should — have attempted to avail himself of § 5-4-618 at trial. Even though the federal district court, in dismissing Engram's *habeas* petition, noted that Engram "did not present the federal constitutional dimensions of his *Atkins* claim to the state courts," Engram *could have* raised the issue well before now, as was done in *Atkins*. There, Mr. Atkins raised the issue in his trial, even knowing that the Supreme Court had considered and rejected a similar constitutional argument in *Penry v. Lynaugh*. There is simply no merit to Engram's contention that he could not have made his federal constitutional argument before now.[5]

■ Further, this court has already held that the Supreme Court's decision in *Atkins* "merely reaffirmed this state's pre-existing prohibition against executing the mentally retarded" found in § 5-4-618. *See Anderson v. State*, 357 Ark. 180, 163 S.W.3d 333 (2004). Engram, of course, takes issue with this interpretation, arguing that § 5-4-618 and the holding in *Atkins* "are not the same," since *Atkins* removes the mentally retarded from the class of persons eligible for the death penalty, while the statute makes the issue something that can be waived by not raising it before trial. However, *Atkins* explicitly noted that "[n]ot all people who claim to be mentally retarded will be so impaired as to fall within the range of mentally retarded offenders about whom there is a national consensus. . . . [Therefore], we leave to the States the task of developing appropriate ways to enforce the constitutional restriction upon their execution of sentences." *Atkins*, 536 U.S. at 317. Arkansas has made § 5-4-618 the "way[ ] to enforce the constitutional restriction," and Engram did not comply with it. *See Anderson, supra* (pointing out that § 5-4-618 "specifically places the burden on the defendant to prove mental retardation at the time of committing the offense by a preponderance of the evidence").

---

trial record. It was Engram's responsibility to file a motion under § 5-4-618 to avoid application of the death penalty. *See Rankin, supra*.

[5] It is also apparent that Engram has not heretofore had a problem with raising constitutional arguments he was sure to lose on: in his direct appeal, he argued both that there was an unconstitutional overlap between capital murder and first-degree murder, and that the admission of victim-impact evidence is unconstitutional. *See Engram*, 341 Ark. at 206, 209. Indeed, with respect to both of those arguments, this court noted that Engram conceded in his brief that "this court ha[d] resolved this issue unfavorably to his position in numerous cases." *Id*. Clearly, had he wanted to raise the mental retardation issue before, he would have.

█ Engram alternatively argues that he should be permitted to file a Rule 37 petition for postconviction relief. As mentioned above, following this court's initial decision in *Engram*, Engram was appointed counsel to pursue any appropriate Rule 37 relief. At a hearing held on June 25, 2001, Engram's appointed attorney informed the trial court that she had reviewed the record, discussed the matter with Engram, and concluded that there were no "issues that were appropriate for Rule 37.5 relief." Counsel therefore concluded that the next step for Engram would be to pursue federal *habeas* relief. Upon questioning by the court, Engram stated that he agreed with his attorney's assessment. Thus, Engram had the opportunity to pursue any available or appropriate Rule 37.5 relief, and chose not to do so.[6]

In any event, the time for filing a Rule 37 petition is long since past; the rule provides that a petition for postconviction relief must be filed within sixty days of the mandate being issued following direct appeal. The cases on which Engram relies — *Jackson v. State*, 343 Ark. 613, 37 S.W.3d 595 (2001), and *Porter v. State*, 339 Ark. 15, 2 S.W.3d 73 (1999) — are factually distinguishable. Although this court in those two cases permitted the filing of a Rule 37.5 petition outside the time limits prescribed in the rule, in *Jackson*, it was because there was some confusion about *when* Jackson's attorney had been appointed; in *Porter*, there was a question about *whether* Porter had been appointed counsel. In *Porter*, this court noted the following:

> Rule 37.2(c) clearly states that if an appeal was taken of the judgment of conviction, a petition claiming relief under this rule must be filed in the circuit court within sixty days of the date the mandate was issued by the appellate court. We have held that the filing deadlines imposed by this section are jurisdictional in nature

---

[6] Even if Engram had opted to argue in a postconviction proceeding that his trial attorneys were ineffective for failing to raise or preserve the issue of his alleged mental retardation, it is unlikely that he would have been successful. This court has frequently held that it is not ineffective assistance of counsel to fail to make a meritless objection. *See Lee v. State*, 343 Ark. 702, 38 S.W.3d 334 (2001); *Trimble v. State*, 336 Ark. 437, 986 S.W.2d 293 (1999). According to Dr. Anderson, Engram's IQ was, at the lowest possible range, a 76. As noted above, Arkansas has established an IQ of 65 as the point at which it may be presumed that a defendant is mentally retarded. Therefore, Engram's trial attorneys could have reasonably considered it fruitless to raise the issue of whether Engram was mentally retarded, and they most likely would not have been found ineffective for their failure to do so.

and that if they are not met, a circuit court lacks jurisdiction to consider a Rule 37 petition or a petition to correct an illegal sentence on its merits. *Petree v. State*, 323 Ark. 570, 920 S.W.2d 819 (1995).

However, while there is no constitutional right to a postconviction proceeding, when a State undertakes to provide collateral relief, due process requires that the proceeding be fundamentally fair. *See Larimore v. State*, 327 Ark. 271, 938 S.W.2d 818 (1997) (quoting *Robinson v. State*, 295 Ark. 693, 751 S.W.2d 335 (1988)). Here, the question becomes whether it is "fundamentally fair" to require an inmate on death row to abide by the stringent filing deadlines when he was under the impression he was represented by counsel and that said counsel was timely filing the proper pleadings (such as a petition under Rule 37) on his behalf.

*Porter*, 339 Ark. at 18.

■ Here, unlike the situations in *Jackson* and *Porter*, there has been no confusion about when filing deadlines occurred or about whether counsel had been appointed. Engram and his Rule 37 attorney made a deliberate decision not to pursue postconviction relief. There is no provision in our law that provides for petitions for "post-postconviction relief," i.e., a mechanism for filing an ineffective-assistance-of-counsel petition with respect to the counsel appointed to handle the Rule 37 petition. Engram's state court remedies with respect to postconviction relief have been exhausted.

■ Finally, Engram suggests that he might be able to pursue some form of state *habeas* relief, since there is no time limit on filing a petition for writ of *habeas corpus* based on an illegal sentence. *See Renshaw v. Norris*, 337 Ark. 494, 989 S.W.2d 515 (1999) (to impose time limits on *habeas* relief "would contravene the proscription against suspending the right to *habeas corpus*."). However, a writ of *habeas corpus* will only be issued if the commitment was invalid on its face, or the sentencing court lacked jurisdiction. *See Flowers v. Norris*, 347 Ark. 760, 68 S.W.3d 289 (2002). Clearly, the sentencing court in Engram's case possessed jurisdiction, and because Engram failed to get a ruling from the court that he was mentally retarded, the sentence of death was not invalid. Therefore, state *habeas* relief is not a proper avenue for Engram.

In sum, this court declines to recall its mandate and reopen the case. Engram's situation is factually and legally distinguishable from the *Robbins* case; the time for seeking Rule 37 relief is long past; and state *habeas* relief is not appropriate. Because the record reflects that Engram has exhausted his right to assert an *Atkins* defense in state court, he is left to pursue any such relief in the federal courts.

CORBIN, BROWN, and THORNTON, JJ., dissent.

R OBERT L. BROWN, Justice, dissenting. This case concerns whether the state courts or the federal courts should decide the mental-retardation issue that was raised by Engram before his trial in 1998.[1] The issue was raised by Engram and developed before the circuit court, but it was not ruled on by that court. This was contrary to Act 420 of 1993, now codified at Ark. Code Ann. § 5-4-618(d)(2) (Repl. 1997), which mandates that "the court *shall* determine if the defendant is mentally retarded," after the issue is raised. (emphasis added). That legislative directive was not followed in the instant case.

For this reason, I would recall the mandate and remand to the circuit court for the limited purpose of deciding the issue of mental retardation based on the record that has already been developed. By failing to do this, this court is eschewing our state responsibility, and the federal court will now be forced to relitigate the mental-retardation issue, beginning at square one. That will needlessly delay resolution of this matter.

The federal district court concluded in its remand order that "a substantial possibility exists that the Arkansas Supreme Court will recall the mandate in this case to consider [Engram's] *Atkins* [*v. Virginia*, 536 U.S. 304 (2002) (execution of the mentally retarded is unconstitutional)] claim." Because the claim had not previously been presented to the state court, according to the federal district court, it was affording Engram an opportunity to exhaust his state

---

[1] The majority opinion suggests that mental retardation was not raised at the 1998 pre-trial hearing. At the beginning of the hearing, the circuit court asked what the hearing was about and defense counsel answered: "competency, responsibility and IQ to determine whether Mr. Engram is mentally retarded." To require a written motion as opposed to an oral motion, as the majority appears to do, needlessly exults form over substance in this highly sensitive area, especially when the circuit court knew what the hearing was about and testimony was taken on the subject of Engram's mental ability.

remedies in the interest of "comity and federalism" before proceeding further in federal court. By invoking the exhaustion-of-state-remedies doctrine, the federal district court adhered to its longstanding rule of giving deference to the states, but it also invoked the spirit of Congress's Antiterrorism and Effective Death Penalty Act of 1996 and the Arkansas Effective Death Penalty Act of 1997, now codified at Ark. Code Ann. § 16-91-201 through 16-91-206 (Supp. 2003). Both the congressional act and state act provide for a comprehensive state review of death cases as an antidote to multiple federal *habeas corpus* reviews. It is that comprehensive state review that now is lacking owing to this court's failure to resolve all state issues.

What the federal district court may not have known when it invoked the exhaustion doctrine is that mental retardation was in fact raised on Engram's behalf at a pretrial hearing in state court in 1998. Prior to trial, the circuit court conducted a hearing on Engram's competency *and* mental retardation. On the prosecutor's motion, the court found Engram competent to stand trial but did not rule on whether he was mentally retarded. Again, this error was made even though testimony had been taken relating to the question of Engram's mental retardation and even though our state statute enacted in 1993 provides that where a motion relating to mental retardation is made, "the court *shall* determine if the defendant is mentally retarded." Ark. Code Ann. § 5-4-618 (d)(2) (Repl. 1997) (emphasis added).

The majority appears to contend that a circuit court ruling on mental retardation was not really necessary, because there was testimony that Engram's intelligence quotient in 1998 was 76 and the presumptive level for mental retardation fixed by § 5-4-618(a)(2) is 65. But that conclusion casts a blind eye to the statutory mandate that the circuit court *shall* rule when the issue is raised. Moreover, a 65 I.Q. is only a presumptive benchmark and is not conclusive on the issue, as the definition of "mental retardation" in § 5-4-618(a)(1) makes crystal clear. As a final note, I disagree that speculation on what the circuit court *probably* would have done is appropriate in a death case by an appellate court. Rather, our role should be to assure that the matter was properly ruled upon by the circuit court.

Let me hasten to underscore that my position in this case is based on the fact that the mental-retardation claim was raised after § 5-4-618(d)(2) became law in 1993 and was never decided by the circuit court. My position is not based on the *Atkins v. Virginia,*

*supra,* decision or on Engram's argument that post-*Atkins,* all death cases are subject to being reopened for a mental retardation evaluation. My dissent is solely based on the failure to comply with our state statute.

As already noted, it is clearly incumbent on state courts to provide a full, complete, and comprehensive review in death cases. I conclude that this review was not perfected, as required by § 5-4-618(d)(2), because the mental-retardation issue was not resolved by the circuit court which involved the imposition of the death penalty and was a matter essential to the jury's consideration of the death penalty. *See Wicks v. State,* 270 Ark. 781, 606 S.W.2d 366 (1980). Though no objection was made by defense counsel to the circuit court's failure to rule on the matter, these facts fall within the first *Wicks* exception to our requirement that such an objection be made. This court has left no doubt that the death penalty "is a unique punishment that demands unique attention to procedural safeguards." *Robbins v. State,* 353 Ark. 556, 561, 114 S.W.3d 217, 220 (2003). Like *Robbins,* in this case there was error committed on an issue of profound significance that was mandated by state statute.

For these reasons, I respectfully dissent.

CORBIN, J., joins in this dissent.

RAY THORNTON, Justice, dissenting. This case arises from a motion filed by petitioner, Andrew Engram, on November 5, 2003, to recall the mandate and to reopen his case. The majority declines to recall the mandate and reopen the case on the basis that the issue of mental retardation was not ruled upon at the competency hearing, that it was not raised in a direct appeal, and that petitioner waived any potential Rule 37 relief. I respectfully disagree. I believe that petitioner's case falls under the first *Wicks* exception, which provides that we may consider an argument raised for the first time on appeal when "the trial court[ ] fail[ed] to bring to the jury's attention a matter essential to its consideration of the death penalty itself." *See Wicks v. State,* 270 Ark. 781, 606 S.W.2d 366 (1980).

## I. Robbins

The issue in this case is whether extraordinary circumstances exist to warrant recalling the mandate and opening appellant's case. Appellant argues that, pursuant to our decision in *Robbins VI, supra,* we should recall the mandate issued on January 12, 2001, and allow

appellant to exhaust his claims, including the issue of mental retardation, in Pulaski County Circuit Court.

In *Robbins VI, supra,* we recognized that the death penalty demands unique attention to procedural safeguards, and citing both federal and state case law to support this proposition, we stated:

> The United States Supreme Court has made that abundantly clear. *See, e.g., Caldwell v. Mississippi,* 472 U.S. 320, 329, 105 S. Ct. 2633, 86 L. Ed. 2d 231 (1985) ("This Court has repeatedly said that under the Eighth Amendment 'the qualitative difference of death from all other punishments requires a correspondingly greater degree of scrutiny of the capital sentencing determination.' ") (quoting *California v. Ramos,* 463 U.S. 992, 998-999, 103 S. Ct. 3446, 77 L. Ed. 2d 1171 (1983)); *Zant v. Stephens,* 462 U.S. 862, 884-885, 103 S. Ct. 2733, 77 L. Ed. 2d 235 (1983) ("[B]ecause there is a qualitative difference between death and any other permissible form of punishment, there is a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case.") (quotations omitted); *Woodson v. North Carolina,* 428 U.S. 280, 305, 96 S. Ct. 2978, 49 L. Ed. 2d 944 (1976) ("[T]he penalty of death is qualitatively different from a sentence of imprisonment, however long. Death, in its finality, differs more from life imprisonment than a 100-year prison term differs from one of only a year or two."); *Eddings v. Oklahoma,* 455 U.S. 104, 118, 102 S. Ct. 869, 71 L. Ed. 2d 1 (O'Connor, J., concurring) ("[T]his Court has gone to extraordinary measures to ensure that the prisoner sentenced to be executed is afforded process that will guarantee, as much as is humanly possible, that the sentence was not imposed out of whim, passion, prejudice, or mistake.").

> This court, early on, voiced its belief in the "humane principle applicable in general to criminal cases, and especially those where life is involved," and declined to exalt form over substance when dealing with the death penalty. *Bivens v. State,* 11 Ark. 455, 457 (1850).

*Robbins VI, supra.*

Robbins petitioned our court to recall the mandate and reopen his case because he alleged that we failed to recognize that the jury was inconsistent in completing Verdict Form 2, which deals with mitigating circumstances. *Id.* The State maintained that his claim was barred, particularly in light of our Rule 4-3(h) review of Robbins's case. *Id.*

We held that the mandate should be recalled and the case reopened for three reasons. *Id*. First, we recognized that our decision in *Willett v. State*, 322 Ark. 613, 911 S.W.2d 937 (1995), might require resentencing, as there was an alleged comparable verdict form deficiency in *Willett*. Second, we acknowledged that the federal district court dismissed Robbins's *habeas corpus* petition because the verdict-form issue had not been addressed in our court, notwithstanding that there had been five appellate reviews by our court. *See State v. Robbins*, 342 Ark. 262, 27 S.W.3d 419 (2000) ("*Robbins V*") (holding that no Rule 4-3(h) errors, *Wicks* errors, or errors implicating other fundamental safeguards occurred during the trial); *State v. Robbins*, 339 Ark. 379, 5 S.W.3d 51 (1999) ("*Robbins IV*") (holding that, in death-penalty cases, we must conduct an independent review of the record to determine whether errors occurred under Rule 4-3(h), whether any *Wicks* violations occurred, or whether fundamental safeguards were in place during the trial); *State v. Robbins*, 337 Ark. 227, 987 S.W.2d 709 (1999) ("*Robbins III*") (recalling the mandate, staying the execution, and ordering briefing from Robbins and the State); *State v. Robbins*, 336 Ark. 377, 985 S.W.2d 296 (1999) ("*Robbins II*") (*per curiam*) (waiving his right to seek Rule 37 postconviction relief); *State v. Robbins*, 335 Ark. 380, 985 S.W.2d 293 (1998) ("*Robbins I*") (*per curiam*) (waiving his right to an appeal). Third, we emphasized that a heightened scrutiny is required in a death-penalty case. Finally, we noted that the original verdict forms were not included in the record. We issued a writ of *certiorari* and ordered that the record be supplemented with the original verdict forms. *Id*.

Petitioner's case is similar to *Robbins VI, supra*, in that his case has been dismissed in federal court to allow him to pursue additional claims, including the claim involving mental retardation, in state court. Petitioner's case is also similar to *Robbins VI, supra*, in that the death penalty has been imposed.

However, in this proceeding, petitioner asks us to reinvest jurisdiction in the trial court for consideration of his claim of mental retardation pursuant to *Atkins, supra*. In *Atkins*, the Supreme Court held that the executions of mentally retarded criminals constitute cruel and unusual punishment prohibited by the Eighth Amendment. The Court found that its death penalty jurisprudence provided "two reasons consistent with the legislative consensus that the mentally retarded should be categorically excluded from execution." *Id*. First, the Court noted, "there is a

serious question as to whether either justification that we have recognized as a basis for the death penalty applies to mentally retarded offenders." *Id.* The Court further stated that "[t]he reduced capacity of mentally retarded offenders provides a second justification for a categorical rule making such offenders ineligible for the death penalty." *Id.*

It is well-established that the issue of competency is determined by an application of statutory criteria that are not the same as those used to determine mental retardation. The standard under our law for determining competency for purposes of execution is whether a condemned person understands "the nature of and reason for the punishment." *Singleton v. Norris*, 332 Ark. 196, 199, 964 S.W.2d 366 (1998) (citing Ark. Code Ann. § 16-90-506(d)(1)(A) (Supp. 1997)).

In the present case, petitioner was found to be competent at his competency hearing held on March 19, 1998, but the trial court made no finding as to mental retardation. At the beginning of the hearing, the issue of mental retardation was raised in the following colloquy:

> THE COURT: All right. This is case 97-2685, State of Arkansas versus Andrew Engram. Mr. Fraiser is here with the prosecutor's office and Ms. Harris and Mr. Qualls are here for the defendant. And this is a hearing on competency, is that correct, Mr. Qualls?
>
> MR. QUALLS: That's correct, Your Honor. Competency, responsibility and IQ to determine whether Mr. Engram is mentally retarded.
>
> THE COURT: All right, then. You may proceed.

Evidence was presented by Dr. John Anderson of the Arkansas State Hospital that petitioner's IQ was in the range of seventy-six to eighty-six. Dr. Anderson based his testimony upon information in the prosecutor's file, social history, psychiatric interviews, the Kaufman Brief IQ Test, and the results from the MMPI. Dr. Anderson testified that he believed petitioner did not have mental retardation and that petitioner was competent to stand trial, but testified on cross-examination that petitioner could fall within a borderline range between mental retardation and average functioning.

The issue of mental retardation was raised by defense counsel at the competency hearing, but the trial court never ruled on it.

Nor did defense counsel request such a finding. When the State asked the trial court to find petitioner competent, the trial court replied, "So be it," and requested that the State prepare an order "reflecting that[.]" No such order is contained in the record.

The issue of mental retardation was not raised on direct appeal, and petitioner's postconviction counsel failed to file a Rule 37 petition within the sixty-day limit after our mandate issued on January 12, 2001, as required by Ark. R. Crim. P. 37.2, but rather waived any potential claims at the Rule 37 hearing on June 25, 2001, which was conducted approximately five months after our mandate issued. At that hearing, petitioner's postconviction counsel expressed a desire to proceed under *habeas* proceedings in federal district court without first exhausting state claims.

## II. Wicks exception

Because the trial court failed to rule on the issue of mental retardation in petitioner's competency hearing, the question is whether a *Wicks* exception is applicable to the present case.

We recognize claims of fundamental error through *Wicks v. State,* 270 Ark. 781, 785, 606 S.W.2d 366, 369 (1980). The four recognized *Wicks* exceptions are: (1) when the trial court fails to bring to the jury's attention a matter essential to its consideration of the death penalty itself; (2) when defense counsel has no knowledge of the error and hence no opportunity to object; (3) when the error is so flagrant and so highly prejudicial in character as to make it the duty of the court on its own motion to have instructed the jury correctly; and (4) under Ark. R. Evid. 103(d) the appellate court is not precluded from taking notice of errors affecting substantial rights, although they were not brought to the attention of the trial court. *Anderson v. State,* 353 Ark. 384, 108 S.W.3d 592 (2003).

Petitioner has framed his argument in such a way that it falls under the first *Wicks* exception, which informs us that in cases in which the death penalty is imposed, we do review "the trial court's failure to bring to the jury's attention a matter essential to its consideration of the death penalty itself" without the requirement of an objection by counsel. *Wicks, supra.* In *Wicks,* we cited two examples of the first exception to our objection rule. In *Wells v. State,* 193 Ark. 1092, 104 S.W.2d 451 (1937), the trial court failed to require the jury to find the degree of the crime, as required by statute, so the jury might have imposed the death penalty for a

homicide below first-degree murder. In *Smith v. State*, 205 Ark. 1075, 172 S.W.2d 248 (1943), the trial court failed to tell the jury that it had the option of imposing a life sentence.

In this case, at the time of the competency hearing, the trial court was well aware that Ark. Code Ann. § 5-4-618 (Repl. 1997), which prohibits the execution of persons with mental retardation, was already in effect. Arkansas Code Annotated § 5-4-618 provides in pertinent part:

(a)(1) As used in this section, "mental retardation" means:

(A) Significantly subaverage general intellectual functioning accompanied by significant deficits or impairments in adaptive functioning manifest in the developmental period, but no later than age eighteen (18); and

(B) Deficits in adaptive behavior.

(2) There is a rebuttable presumption of mental retardation when a defendant has an intelligence quotient of sixty-five (65) or below.

(b) *No defendant with mental retardation at the time of committing capital murder shall be sentenced to death.*

(c) The defendant has the burden of proving mental retardation at the time of committing the offense by a preponderance of the evidence.

(d)(1) A defendant on trial for capital murder shall raise the special sentencing provision of mental retardation by motion prior to trial.

(2) *Prior to trial, the court shall determine if the defendant is mentally retarded.*

*Id.* (emphasis added).

With regard to Ark. Code Ann. § 5-4-618, we stated in *Anderson v. State*, 357 Ark. 180, 163 S.W.3d 333 (2004):

We believe that the Court in *Atkins* merely reaffirmed this state's pre-existing prohibition against executing the mentally re-

tarded. Section 5-4-618(b), which is part of Act 420 of 1993, provides that no defendant with mental retardation at the time of committing capital murder shall be sentenced to death . . .

Section 5-4-618(a)(2) establishes a rebuttable presumption of mental retardation when a defendant has an intelligence quotient of sixty-five or below. *See* Ark. Code Ann. § 5-4-618(a)(2) (Repl. 1997). It specifically places the burden on the defendant to prove mental retardation at the time of committing the offense by a preponderance of the evidence. *See* Ark. Code Ann. § 5-4-618(c). The statute then sets forth the procedure by which a defendant charged with capital murder shall raise the special sentencing provision of mental retardation.

*Anderson, supra.* I believe Ark. Code Ann. § 5-4-618, which was already in effect at the time of *Atkins, supra,* is the Arkansas Legislature's method of assuming the "task of developing appropriate ways to enforce the constitutional restriction upon its execution of sentences." *Atkins, supra* (quoting *Ford v. Wainwright,* 477 U.S. 399 (1986)).

I maintain that petitioner's case falls within the first *Wicks* exception because the trial court did not make a ruling on the question whether petitioner is mentally retarded, as required by Ark. Code Ann. § 5-4-618(a)(2). Here, the trial court abused its discretion in failing to take appropriate action to ensure that the death penalty would be imposed only after a determination is made that the accused is not mentally retarded. This ruling was essential because the death penalty would not have been presented to the jury for their consideration if the trial court had ruled that the petitioner was mentally retarded under Ark. Code Ann. § 5-4-618. Therefore, I conclude that the trial court's failure to make a determination as to mental retardation, pursuant to Ark. Code Ann. § 5-4-618, constituted a failure by the trial court "to bring to the jury's attention a matter essential" to the imposition of the death penalty under *Wicks, supra.*

For the foregoing reasons, I would grant petitioner's motion to recall the mandate, and I would remand the matter to the trial court for the limited purpose of making a determination of whether petitioner is mentally retarded in accordance with the requirements of Ark. Code Ann. § 5-4-618 and *Atkins, supra.*