

# SUPREME COURT OF ARKANSAS

**No.** CR–91–36

| | |
|---|---|
| BRUCE EARL WARD<br>PETITIONER<br><br>V.<br><br><br>STATE OF ARKANSAS<br>RESPONDENT | **Opinion Delivered** FEBRUARY 26, 2015<br><br>MOTION TO RECALL THE MANDATE [PULASKI COUNTY CIRCUIT COURT, FIRST DIVISION, NO. 60CR-89-1836]<br><br><br><br>MOTION DENIED. |

**PAUL E. DANIELSON, Associate Justice**

Petitioner Bruce Earl Ward moves this court to recall the mandate in *Ward v. State*, 308 Ark. 415, 827 S.W.2d 110 (1992) (*Ward I*), the direct appeal of his conviction for capital murder.[1] In *Ward I*, this court affirmed Ward's conviction for capital murder, but reversed his death-penalty sentence and remanded for resentencing. In the instant motion to recall the mandate, Ward asserts that a recall is warranted because there was a defect or breakdown in the appellate process when this court failed to recognize the circuit court's violation of *Ake v. Oklahoma*, 470 U.S. 68 (1985), and appellate counsel failed to raise the issue in Ward's direct appeal. We deny the motion.

---

[1]Simultaneously submitted with the instant motion is Ward's motion to recall the mandate in his appeal following his resentence to the death penalty in *Ward v. State*, 338 Ark. 619, 1 S.W.3d 1 (1999) (*Ward III*), and his motion to recall the mandate in his appeal from the denial of his petition for postconviction relief under Arkansas Rule of Criminal Procedure 37.5, *Ward v. State*, 350 Ark. 69, 84 S.W.3d 863 (2002) (*Ward IV*).

The facts relevant to the instant motion, as taken from the record, are these.[2] Ward was charged with capital murder in connection with the death of Rebecca Doss, a clerk at a Jackpot convenience store in Little Rock. At his plea and arraignment hearing, Ward pleaded not guilty to the charge. At the hearing on October 9, 1989, the circuit court asked whether there was any possibility of Ward claiming that he was not guilty by reason of mental disease or defect. Ward's defense counsel answered in the affirmative, but explained that he wished to communicate more with Ward about it and would keep the court apprised.

Ward subsequently changed his plea to not guilty by reason of mental disease or defect, and the circuit court entered an order for Ward's commitment to the Arkansas State Hospital for examination and observation for a period not to exceed thirty days. The report by Drs. Michael Simon, the supervising forensic psychologist, and O. Wendell Hall, the forensic medical director, resulting from that examination was filed with the circuit court on December 14, 1989, and provided, in relevant part:

> This is to certify that this is a true and correct report of the findings in the above case as derived from the following: 1) Historical data from outside sources; 2) Medical history, physical and neurological examinations; 3) Laboratory and other physical studies; 4) Psychological assessment by staff psychologist.
>
> Diagnosis: Axis I – None; Axis II – Antisocial Personality Disorder.
>
> The defendant appears to be aware of the nature of the charges and the proceedings taken against him. He is capable of cooperating effectively with an attorney in the preparation of his defense.

---

[2]The record is the very same that was reviewed by this court in *Ward I*.

SLIP OPINION

At the time of the commission of the alleged offense, the defendant did not lack the capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law.

Ward disputed the report and requested a competency hearing, which was held on January 18, 1990. At the hearing, Dr. Simon, who had been Ward's evaluating psychologist, testified that Ward spent around sixteen days on the forensic unit of the hospital, arriving on November 29, 1989, and departing around December 14 or 16.[3] During that time, Dr. Simon said, he had interviewed Ward twice and had seen him at a staffing. Dr. Simon testified that while he could not recall the specifics of his first interview with Ward, he assumed that he had interviewed him, which would have included discussing why Ward was there, if Ward understood why he had been sent to the hospital, and what the hospital's role was and what it was to do. Dr. Simon's belief was that the first interview lasted anywhere from forty-five minutes to an hour in duration.

Dr. Simon testified that in the subsequent interview of Ward, which he surmised lasted a little longer than the first, he had performed a verbal IQ test on Ward that he believed to be "fairly reliable." He stated that Ward had scored well above average, which would rule out any kind of mental retardation. Dr. Simon further testified that he had administered a "proverbs test" and the "Competency to Stand Trial Assessment Instrument."

---

[3]Dr. Simon guessed that the average stay at the hospital for an evaluation was between two and three weeks. At a prior hearing held January 4, 1990, defense counsel for Ward stated that the hospital did a "land speed record" on Ward, admitting him on November 29 and returning him to the jail on December 12. The prosecutor took credit for the quick turnaround, stating that because he wanted a quick resolution of Ward's trial, he "begged the director and he made a spot for him and took him in."

With regard to the report filed with the court, Dr. Simon testified that the historical data to which he referred was information from Pennsylvania, where Ward had previously spent time; he was unsure, however, of the source of the information, stating that it came from either the Pennsylvania Department of Correction or the police. Dr. Simon further explained that physical and neurological examinations were routine and, he assumed, had been conducted. Finally, when asked of his psychological assessment referenced in the report, Dr. Simon responded that Ward's Axis II diagnosis of antisocial personality disorder was "based on historical information, [Ward's] history of getting in trouble with the law, [and] not following societal rules."

Dr. Simon then described the typical staffing conducted prior to a report being issued. He testified that it typically lasts an hour and one-half to two hours and that the process includes a presentation of each participant's information on the patient, discussion of the patient and the information, an interview of the patient, and a final decision, typically reached by consensus. Dr. Simon recalled that he was present at Ward's staffing along with Dr. Hall; Dr. Bunton, Ph.D., psychologist; Marlo Gurgley, social worker; and Jim Gregory, social worker intern; but, he stated, there could have been more. He further testified that, while the data from the social worker usually includes information on the patient obtained from other sources, such as family, and past records, including medical and criminal, a history on Ward, other than his criminal history, was lacking because of Ward's refusal to allow contact with his family.

Dr. Simon testified that he neither observed any psychotic behavior by Ward, nor observed any behavior to indicate the presence of a mental disease or defect. He further explained that antisocial personality disorder is not the type of disorder that would cause one to be incompetent to stand trial or to lack appreciation for the criminality of his acts and opined that Ward did not suffer from a mental disease or defect at the time of the incident that would have rendered him incapable of conforming his conduct to the law, that he could appreciate the criminality of his conduct, and that he was capable of understanding court procedure and assisting in his defense.

Dr. Hall also testified about his familiarity with Ward, stating that he had sat in on Ward's staffing and reviewed his records, many of which had been obtained from the prosecutor's case file. He explained that, while his personal contact with Ward was brief, he was aware that Ward had not caused any disruption on the observation unit or been difficult with the nursing staff. Dr. Hall observed that Ward's case seemed to be a "straightforward" one and that he believed Ward to be the most intelligent defendant that the unit had examined in the last two and one-half years, or as long as Dr. Hall had been working at the state hospital.

Dr. Hall agreed that Ward was competent to participate in his own defense and that he was capable of understanding the criminality of his act at the time it had allegedly been committed. In describing Ward's Axis II diagnosis of antisocial personality disorder, Dr. Hall stated that it

refers to a basic kind of personality, basic patterns of behavior. It this [*sic*] case is a maladaptive behavior, way of dealing with life. . . . The past history is extremely important in arriving at that diagnosis. . . . Yes, [also relevant to Ward's diagnosis of antisocial personality disorder was that he showed no evidence of anxiety or depression and his lack of worry about his present circumstance appeared notable.] . . . [It is relevant because i]t's fairly common for antisocial personalities to actually show very little anxiety at all even in situations that most people would really be in a sweat about. He seems kind of unconcerned about it. . . . [A diagnosis of antisocial personality disorder relates to a finding of competency at the time of the incident in that t]he antisocial personality doesn't have any impairment of [Ward's] ability to think or reason or impair his judgment. It's more of a way of like dealing with himself as being more important than other people and really being outside the rules that other people have to go by.

Dr. Hall also opined that he was confident with the judgment that he and the staffing committee had reached on Ward's culpability.

At the conclusion of the testimony, Ward challenged the report, asserting that an adequate evaluation had not been performed. Specifically, he pointed to the rushed nature of the evaluation, alleging that had more time been taken, a different diagnosis might have resulted. He then requested an independent psychiatric evaluation.

The circuit court denied Ward's motion, stating that he

failed to meet the burden. . . . The burden was on you.
    As a matter of fact, specifically, the doctor—neither doctor was asked if he had more time would it in any way, shape, form or fashion probably alter his opinion. I get the distinct impression that they were not pressed for time. These are bureaucrats. They get paid regardless. They're going to spend all the time necessary. I didn't see anything in any question that you asked or anything to alert me that this wasn't a good, straightforward evaluation.

Ward again challenged the speed of the evaluation, contesting the circuit court's ruling that "they had all the time in the world," and the circuit court ruled that Ward "failed to meet the burden that they needed more time."

The next day, Ward filed a motion for the appropriation of funds for expert assistance, relying on the United States Supreme Court's ruling in *Ake, supra*.[4]  In it, he requested an order authorizing defense expenditures in an amount not to exceed $10,000 "to enable the accused to hire a licensed psychologist and/or a licensed psychiatrist in preparations for and assistance during trial."  He further sought an ex parte hearing under *Ake, supra*.  Ward explained that he sought the funds to aid his defense counsel and to adequately explore and establish the existence of potentially mitigating factors, such as that the murder was committed while Ward was under extreme mental or emotional disturbance.  The State countered Ward's motion, contending that Ward had failed to present the court with any evidence to indicate that a reevaluation of Ward by another expert was necessary.

The circuit court took Ward's motion up at a hearing held February 8, 1990.  At that time, defense counsel clarified the motion, stating that it sought funds for expert assistance, "not for the guilt or innocence phase, [but] more for the mitigation evidence at penalty phase if we are to get there."  Ward alleged that the evaluation was "inadequate for purposes of mitigation," because the evaluators relied almost solely on the State's file and did not conduct adequate psychological and intellectual testing.  Ward further pointed to the failure of the evaluators to contact several doctors that Ward had seen in Pennsylvania and explained that

---

[4]In *Ake*, the United States Supreme Court held that "when a defendant has made a preliminary showing that his sanity at the time of the offense is likely to be a significant factor at trial, the Constitution requires that a State provide access to a psychiatrist's assistance on this issue if the defendant cannot otherwise afford one."  470 U.S. at 74.

SLIP OPINION

he wanted his "expert to talk to [those doctors], review the testing that they did, to actually take a real history and not just rely on the State's file."

The circuit court ultimately denied Ward's motion, stating that the public defender's office had a budget of $650,000 and that it was up to "that office" how to spend it. Again, Ward clarified the nature of his motion—that the motion was not for money to assist in proving that Ward was not culpable, but was to assist in adequately preparing for the penalty phase of his trial. However, the circuit court did not yield in its denial, reiterating its finding that Ward failed to meet his burden that there was insufficient evidence to question the state hospital's evaluation and telling counsel that "[i]t's just a figment of your imagination."

Ward was ultimately tried and convicted of capital murder; he was then sentenced to death by lethal injection. Ward appealed his conviction and sentence, and this court affirmed the conviction, but reversed the sentence of death and remanded for resentencing, on the basis that the jury had been exposed to unsupported allegations against Ward during the penalty phase of his trial, calling into question the jury's sentence of death. *See Ward I*, 308 Ark. 415, 827 S.W.2d 110. While he was resentenced to death in 1993, this court reversed the sentence on appeal and remanded again for resentencing because the record could not be settled. *See Ward v. State*, 321 Ark. 659, 906 S.W.2d 685 (1995) (per curiam) (*Ward II*). Ward was subsequently resentenced to death in 1997; he appealed, and we affirmed. *See Ward III*, 338 Ark. 619, 1 S.W.3d 1. He also sought postconviction relief pursuant to Arkansas Rule of Criminal Procedure 37.5, which was denied, and this court affirmed the circuit court's denial. *See Ward IV*, 350 Ark. 69, 84 S.W.3d 863.

SLIP OPINION

Ward now moves this court to recall the mandate in *Ward I*.[5] Ward claims that the circuit court wrongfully deprived him of assistance by an independent mental-health expert, who would have concluded that he was incompetent at the time of trial and that he was unable to meaningfully assist his defense counsel. He asserts that this court's failure to notice the circuit court's error in doing so, during its review of his appeal in *Ward I*, constitutes a defect or breakdown in the appellate process warranting a recall of the mandate therein. He avers that a further breakdown in the appellate process occurred when his appellate counsel failed to assert the circuit court's error "or any other claim concerning Mr. Ward's competence" in his *Ward I* appeal. In support of, and relevant to, his motion to recall the mandate in *Ward I*, Ward has submitted to this court a lengthy evaluation report, dated April 2, 2010, by Dr. William S. Logan, as well as an affidavit from Didi Sallings, who represented Ward along with co-counsel in his 1991 trial. In addition, Ward has submitted a social-services report and a psychologist's report that were completed during Ward's evaluation at the state hospital in 1989; however, our review of the record in this case does not reveal that these notes were part of the record reviewed by this court in *Ward I*.

In Dr. Logan's forty-one-page report, he opines that Ward was incompetent to stand trial in 1990 because he did not have a rational understanding of the proceedings and could not meaningfully assist counsel in his defense. Dr. Logan states that he conducted a three-hour psychiatric examination of Ward in 2008 and reviewed a plethora of documents relating

---

[5]This court took Ward's motion as a case, and the parties have now filed briefs for our consideration.

to Ward, including but not limited to, records from his trials, affidavits from his defense counsel, and records from the Arkansas Department of Correction, as well as Ward's school records and military-service records. Dr. Logan concluded that Ward suffers from both persecutory and grandiose delusions and hallucinations, and demonstrates disorganized speech and thought processes, which he noted causes Ward's counsel to have considerable difficulty communicating with and relating to Ward. Additionally, Dr. Logan found that Ward showed dysfunction in several areas of functioning, such as being socially isolated, socially dysfunctional, and neglectful of his personal appearance.

Dr. Logan opined that Ward's symptoms had persisted for over six months, citing concerns raised by his counsel throughout his legal troubles, and he observed that previous evaluations conducted in Arkansas had been incomplete. Specific to Ward's 1989 evaluation, Dr. Logan noted as follows:

> For example, in December 1989, Mr. Ward was found competent to proceed before his first 1990 Arkansas trial, but the relevant report stated that Mr. Ward refused to cooperate with the evaluators, who were left unable to contact his family and thus, to assemble a complete and reliable social history. In addition, the trial court refused to provide funding for Mr. Ward to be evaluated by an independent mental health expert, not employed at the state hospital.

In concluding that Ward was incompetent to stand trial in 1990, Dr. Logan observed the following:

> Although examiners at Arkansas State Hospital found Mr. Ward competent to stand trial, their examination did not focus on Mr. Ward's reasoning or mental process, only his concrete understanding of his legal situation. Subsequent revelations by Mr. Ward reveal considerable paranoid delusional thinking about his 1990 trial and the assistance of his attorneys that caused him to believe the verdict was compromised by a conspiracy against him in which even his attorneys participated. His thinking in this

regard is consistent with a diagnosis of Paranoid Schizophrenia. While his paranoid schizophrenia did not compromise his literal knowledge, the delusional thinking characteristic of this disorder did compromise his rational understanding of the proceedings, and prevented him from having the ability to meaningfully assist his attorney in his defense.

In conclusion, it is my opinion with a reasonable degree of medical certainty that Mr. Ward was suffering from Paranoid Schizophrenia at his 1990 trial and his resulting delusional beliefs prevented him from having the ability to understand rationally the legal proceedings against him and the ability to assist effectively in his own defense.

Likewise, Didi Sallings, who helped defend Ward in his initial trial that was the subject of our review in *Ward I*, described Ward as increasingly and noticeably paranoid. She stated that, during the two years she represented and interacted with Ward, she "noticed a marked and rapid deterioration in his mental health." She described Ward as "completely uncooperative" and "virtually unable to assist in the penalty phase of his trial," and she further relayed that Ward precluded his defense team from contacting his parents in regard to his familial, social, or psychological history.

In response to Ward's motion, the State first contends that the essence of Ward's claim was already rejected by this court in 2010, when it denied a prior petition seeking to have jurisdiction reinvested in the circuit court to seek a writ of error coram nobis based on his claim that he was incompetent at the time of his trial. The State then asserts that Dr. Logan's findings should be viewed with "great suspicion" in light of the fact that he examined Ward only one time and some eighteen years posttrial. But too, the State claims, the issue of Ward's competence to stand trial was settled years ago when no diagnosis was made calling into question his competency; therefore, it maintains, Ward's competency is not a basis for

recalling the mandate in *Ward I*. Neither, according to the State, is Ward's claim that he was entitled to the appointment of an independent mental-health expert. The State posits that Ward's right to an examination under *Ake* was protected when he was evaluated by the state hospital, because it is independent of both the judiciary and the prosecuting attorney's office. Moreover, the State maintains, there was never any showing by Ward that his sanity would be a factor at his trial; therefore, it claims, this is not a circumstance for which this court should recall the *Ward I* mandate.

This court has recognized the inherent power of an appellate court to recall its mandate. *See Nooner v. State*, 2014 Ark. 296, 438 S.W.3d 233. While we have done so, we have emphasized that the power should be used sparingly as a last resort; it is to be "held in reserve against grave, unforseen contingencies." *Nooner*, 2014 Ark. 296, at 9, 438 S.W.3d at 240 (quoting *Robbins v. State*, 353 Ark. 556, 563, 114 S.W.3d 217, 222 (2003)). Because the recall of a mandate of this court is an extremely narrow remedy, it will "be granted only in extraordinary circumstances as a last resort to 'avoid a miscarriage of justice' or 'to protect the integrity of the judicial process.'" *Id.* at 7, 438 S.W.3d at 239 (quoting *Robbins*, 353 Ark. at 563, 114 S.W.3d at 222).

Recalling a mandate is a discretionary act, or "an act of grace by the state that is not constitutionally mandated." *Id.* at 9, 438 S.W.3d at 240 (quoting *Wooten v. Norris*, 578 F.3d 767, 784 (8th Cir. 2009)). To ensure that our discretionary act is not exercised arbitrarily, this court recognizes three relevant factors to be considered when it has been presented with a motion to recall the mandate in a death-penalty case: (1) the presence of a defect or

12

SLIP OPINION

breakdown in the appellate process; (2) a dismissal of proceedings in federal court because of unexhausted state-court claims; and (3) the appeal is a death case requiring heightened scrutiny. *See id.*; *see also Roberts v. State*, 2013 Ark. 57, 426 S.W.3d 372. While we do consider these factors, strict satisfaction of all three factors is not required because this court has the inherent authority to recall its mandate in extraordinary circumstances. *See Nooner*, 2014 Ark. 296, 438 S.W.3d 233.

As already set forth, Ward claims that a defect or breakdown in the appellate process occurred to warrant a recall of the mandate in *Ward I*. We have explained that we will recall a mandate or reopen a case only to address an "error in the appellate process," meaning "an error that *this court* made or overlooked while reviewing a case in which the death sentence was imposed." *Nooner*, 2014 Ark. 296, at 8, 438 S.W.3d at 239 (emphasis in original). Such an error is to be distinguished from one that should have been raised in the circuit court and does not fall within one of the exceptions found in *Wicks v. State*, 270 Ark. 781, 606 S.W.2d 366 (1980), or within our independent review of death cases pursuant to Arkansas Supreme Court Rule 4-3 and Rule 10 of the Arkansas Rules of Appellate Procedure–Criminal. *See id*. Stated more simply, the recall of a mandate is "intended to give this court an opportunity to address an issue that it should have addressed before." *Engram v. State*, 360 Ark. 140, 148, 200 S.W.3d 367, 370 (2004) (emphasis in original omitted). We conclude that Ward has failed to demonstrate such an error.

While Ward asserts that this court failed to recognize error on the part of the circuit court in denying him funds under *Ake* and forcing him to be tried while mentally

incompetent, his argument is simply without any merit. At the conclusion of his competency hearing, Ward did orally request an independent psychiatric evaluation, asserting that had a lengthier and more intensive evaluation been conducted, a different diagnosis might have been had. The circuit court denied that request, ruling that Ward had not presented sufficient evidence to question the evaluation's validity.

We cannot say that the circuit court's denial of Ward's oral request was error that this court should have recognized and addressed in its decision in *Ward I.* Although Ward did not cite to *Ake* at the time of his oral motion, it is in that case that the United States Supreme Court held as follows: "[W]hen a defendant has made a preliminary showing that his sanity at the time of the offense is likely to be a significant factor at trial, the Constitution requires that a State provide access to a psychiatrist's assistance on this issue if the defendant cannot otherwise afford one." 470 U.S. at 74. In discussing the Supreme Court's decision, we have recognized Arkansas Code Annotated § 5-2-305, which provides the statutory procedures that are to be followed when the defense of mental disease or defect is raised. *See, e.g.*, *Creed v. State*, 372 Ark. 221, 273 S.W.3d 494 (2008). Addressing both the decision and the statute, we have observed the following:

> We have repeatedly held that a defendant's right to examination under *Ake* is protected by an examination by the state hospital as provided by this statute. *Sanders v. State*, 308 Ark. 178, 824 S.W.2d 353 (1992), *cert. denied*, 513 U.S. 1162 (1995); *Day v. State*, 306 Ark. 520, 816 S.W.2d 852 (1991); *Coulter v. State*, 304 Ark. 527, 804 S.W.2d 348, *cert. denied*, 502 U.S. 829 (1991); *Wainwright v. State*, 302 Ark. 371, 790 S.W.2d 420, *cert. denied*, 499 U.S. 913 (1991); *Branscomb v. State*, 299 Ark. 482, 774 S.W.2d 426 (1989). An evaluation performed under this section does not normally require a second opinion, *Richmond v. State*, 320 Ark. 566, 899 S.W.2d 64 (1995), and further evaluation is discretionary with the trial court. *Rucker v. State*, 320 Ark. 643,

SLIP OPINION

899 S.W.2d 447 (1995). Stated simply, the State is not required to pay for a defendant to shop from doctor to doctor until he finds one who will declare him incompetent to proceed with his trial. *Brown v. State*, 316 Ark. 724, 875 S.W.2d 828 (1994). In the present case, appellant was examined at the state hospital, and, thus, the requirements under *Ake* were satisfied.

*Dirickson v. State*, 329 Ark. 572, 576–77, 953 S.W.2d 55, 57 (1997).

First, there is the fact that Ward did not assert his incompetence to stand trial as a basis for his oral request for an independent evaluation; to the contrary, he simply stated that an independent evaluation might yield "a different diagnosis" given more time for the evaluation. Whether the diagnosis sought would have gone to Ward's competency to stand trial or sanity at the time of the offense was never specified or developed by Ward before the circuit court. But, in addition, Ward was examined at the state hospital; therefore, the requirements of *Ake* were satisfied. While he now asserts that he was incompetent to stand trial, the record in *Ward I* is simply devoid of any assertion by Ward of his incompetence to stand trial after he was evaluated by the state hospital. It is patently clear that for this court to have even possibly overlooked an error, error must have in fact occurred in the first instance.

In addition to the circuit court's denial of Ward's oral motion for an independent evaluation, the circuit court also denied Ward's written motion for funds under *Ake*; however, the premise of Ward's motion seeking funds was in no way related to any claim of his incompetence to stand trial. To the contrary, and as already set forth above, Ward's *Ake* motion specifically requested funds to hire a mental–health professional to assist in developing mitigation for the penalty phase of Ward's trial. Ward made no assertion of his need for funds to seek another opinion on his competence to stand trial, either in his motion or in his

arguments to the circuit court. The sole basis for his request for funds, as made clear to the circuit court, was for assistance in exploring and establishing the existence of potentially mitigating factors. As was the case with his oral motion for an independent evaluation, Ward did not assert his incompetence to stand trial as a basis for funds under *Ake*; therefore, the error he now asserts could neither have been discovered, nor overlooked, by this court in its appellate review because the error did not transpire.[6]

In the instant case, Ward claims that in its appellate review, this court overlooked the circuit court's error in denying him an independent evaluation and forcing him to proceed to trial while incompetent. The record makes clear, however, that Ward was evaluated by the state hospital and did not assert his incompetence thereafter as a basis for receiving funds or an independent evaluation. Because this court cannot have overlooked error that did not exist, Ward has failed to establish a breakdown in the appellate process that warrants a recall of the mandate in *Ward I*. Accordingly, we deny Ward's motion.

Motion denied.

*Jennifer Horan*, Federal Defender, by: *Josh Lee*; and *Joseph W. Luby*, Death Penalty Litigation Clinic, for petitioner.
*Dustin McDaniel*, Att'y Gen., by: *Brad Newman*, Ass't Att'y Gen., for respondent.

---

[6]Likewise, Ward's claim that a defect in the appellate process occurred when his appellate counsel failed to raise his perceived constitutional error or challenge his incompetence on appeal fails. While we offer no opinion as to whether Ward's ineffective-assistance claim, if meritorious, could even be considered as a breakdown in the appellate process, it is axiomatic that appellate counsel could not raise on appeal an error that did not occur.