KAREN R. BAKER, Associate Justice
Petitioner, Bruce Earl Ward, requests this court to recall the mandate from his resentencing in Ward v. State , 338 Ark. 619, 622, 1 S.W.3d 1, 3 (1999) ( Ward III ), asserting that he was entitled to an independent defense expert to aid in his defense regarding his competency.
In early 2017, the governor of Arkansas set Ward's execution for April 17, 2017. Subsequently, Ward filed a motion to recall the mandate in this matter and stay of execution until the United States Supreme Court issued its opinion in McWilliams v. Dunn , --- U.S. ----, 137 S.Ct. 1790, 198 L.Ed.2d 341 (2017), contending that McWilliams had a direct impact on his claim pursuant to Ake v. Oklahoma , 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985). Ward further asserts that we should overrule our precedent holding that a competency evaluation at the Arkansas State Hospital satisfies Ake . We granted the stay of execution and took the motion as a case.
This is a death-penalty case with a long history before this court. The facts of Ward's underlying case are as follows:
[O]n August 11, 1989, Little Rock Police Sergeant Michael Middleton was patrolling the area near the Jackpot convenience store on Rodney Parham Drive. Upon pulling into the parking lot, he noticed that the store's clerk was not at her normal work station. He then went into the store to try and locate the clerk. After he had looked through the store and was unable to find the clerk, Middleton called other officers to assist in the search. In the meantime, Middleton began to check outside the store, near the restrooms. He observed Ward walking from the restrooms toward a motorcycle that was parked nearby. Middleton spoke to Ward and told him that he was looking for the store's clerk. Ward told the officer that the clerk was inside the store, stocking. Ward stated that he had just had a cup of hot chocolate with the clerk and that she had given him the key to the restroom. Moments later, Sergeant Scott Timmons discovered [Rebecca] Doss's body lying on the floor of the men's restroom. She had been strangled to death. Ward was arrested and subsequently convicted of the murder.
Ward III , 338 Ark. 619, 622, 1 S.W.3d 1, 3.
In Ward v. State , 308 Ark. 415, 827 S.W.2d 110 (1992) ( Ward I ), we affirmed Ward's capital-murder conviction for the death of Doss. Although we affirmed Ward's conviction, we reversed and remanded for resentencing based on an evidentiary error. Upon remand, Ward was again sentenced to death. However, we reversed and remanded his sentence for a second time because a transcript of the record from the second sentencing was incomplete. Ward v. State , 321 Ark. 659, 906 S.W.2d 685 (1995) ( Ward II ) (per curiam). At his 1997 sentencing, Ward was sentenced to death for a third time. We affirmed his sentence on appeal in Ward III . Ward next filed a petition for postconviction relief under Ark. R. Crim. P. 37.5. We affirmed the circuit court's denial of that petition in Ward v. State , 350 Ark. 69, 84 S.W.3d 863 (2002) ( Ward IV ). On July 16, 2010, Ward filed a petition to reinvest jurisdiction in the circuit court to consider *548 a petition for a writ of error coram nobis asserting he was incompetent at the time of trial and entitled to a writ of error coram nobis. On September 30, 2010, we summarily denied Ward's petition.
In 2013, Ward next filed motions to recall the mandates from his direct appeal ( Ward I ), resentencing ( Ward III ), and the denial of postconviction relief ( Ward IV ) based on his mental competency and asserted that this court should overrule its precedent pertaining to Ake . In Ward v. State , 2015 Ark. 60, 2, 455 S.W.3d 302, 305 ( Ward V ), we denied the motion to recall the mandate in Ward's direct appeal. In Ward VI , 2015 Ark. 60, at 2, 455 S.W.3d 818, at 820, we denied Ward's motion to recall the mandate in Ward's resentencing. In Ward v. State , 2015 Ark. 62, 1, 455 S.W.3d 830 ( Ward VII ), we denied the motion to recall the mandate in Ward's postconviction matter. Accordingly, we denied all three motions to recall the mandates.
Now before the court, Ward has filed a motion to recall the mandate in Ward III , asserting again that Ward was entitled to an independent mental health expert under Ake ; that this court misinterpreted Ake ; that McWilliams could possibly be a seminal case in this area; and that the court should therefore stay his execution pending resolution of this matter. On April 17, 2017, we took the motion as a case and entered a stay of execution. On June 19, 2017, the Supreme Court issued its opinion in McWilliams , and the issue of whether to recall the mandate in Ward's case is now before us. We deny the motion to recall the mandate for the reasons discussed below.
Standard for Recalling the Mandate and the Doctrine of Law of the Case
"The power of an appellate court to recall its mandate, if the circumstances warrant it, is recognized both in federal courts and state courts across the country." Robbins v. State , 353 Ark. 556, 563, 114 S.W.3d 217, 221 (2003) (internal citations omitted). This court will recall a mandate and reopen a case only in extraordinary circumstances. Id. In Nooner v. State , 2014 Ark. 296, at 7-8, 438 S.W.3d 233, 239, we explained our standard for recalling a mandate:
[O]ur decision in Robbins is patently clear that recall of our mandate is an extremely narrow remedy. Indeed, we stated in Robbins that recall of our mandate is to be granted only in extraordinary circumstances as a last resort to "avoid a miscarriage of justice" or "to protect the integrity of the judicial process." See Robbins , 353 Ark. [556, 563],114 S.W.3d [217, 222 (2003) ] (quoting Calderon v. Thompson , 523 U.S. 538, 558, 118 S.Ct. 1489, 140 L.Ed.2d 728 (1998), and Demjanjuk v. Petrovsky , 10 F.3d 338, 357 (6th Cir. 1993) ).
Regardless of any inconsistencies in our decisions concerning the mandatory satisfaction of the three Robbins[1] factors, what has remained consistent in these cases has been a discussion of the three Robbins factors and this court's overarching concern that we will reopen a case only to address an "error in the appellate process," meaning an error that this court made or overlooked while *549 reviewing a case in which the death sentence was imposed. See, e.g. , Engram v. State , 360 Ark. 140, 147, 148, 200 S.W.3d 367, 369, 370 (2004) (observing that the purpose of recalling the mandate in Robbins was to "correct an error in the appellate process" and emphasizing that "the Robbins case hinged on the fact that an error was made during this court's review, and the recall of the mandate was intended to give this court an opportunity to address an issue it should have addressed before"). We have also been consistent in considering motions to recall mandates in criminal cases only where the death penalty has been imposed. See, e.g. , Maxwell v. State , 2012 Ark. 251, 2012 WL 1950253 (per curiam).
Nooner , 2014 Ark. 296, at 8-9, 438 S.W.3d at 239. Accordingly, circumstances requiring this court to recall a mandate occur in extremely limited circumstances.
Next, with regard to the doctrine of law of the case, in United Food & Commercial Workers International Union v. Wal-Mart Stores, Inc. , 2016 Ark. 397, 504 S.W.3d 573, we explained the law-of-the-case doctrine:
[T]he doctrine of law of the case prohibits a court from reconsidering issues of law or fact that have already been decided on appeal. The doctrine provides that a decision of an appellate court establishes the law of the case for trial upon remand and for the appellate court itself upon subsequent review. The doctrine serves to effectuate efficiency and finality in the judicial process, and its purpose is to maintain consistency and to avoid reconsideration of matters once decided during the course of a single, continuing lawsuit.
"As a general rule, we are bound to follow prior case law under the doctrine of stare decisis, a policy designed to lend predictability and stability to the law." Ward VII , 2015 Ark 62, at 5, 455 S.W.3d at 833.
I. The Court Should Recall the Mandate in Ward's Resentencing to Correct a Defect in the Appellate Process
In Ward's motion to recall the mandate, he asserts that he was denied the assistance of a mental-health expert to evaluate, prepare, and present a defense in violation of Ake and urges the court to grant his motion. Ward's argument is two-fold. First, he asserts that the State did not meet the minimum Ake requirements, arguing that this court's interpretation of Ake is a defect in the appellate process. Second, Ward contends that McWilliams clarifies the Ake requirements, and he urges this court to recall the mandate from his resentencing, alleging that his case does not comply with McWilliams .
First, we review Ward's allegation that there is a defect in the appellate process and that this court's interpretation of Ake "falls dramatically short of what Ake requires." Ward contends that this court has misinterpreted and erroneously applied the Ake standard for thirty years. Ward repeatedly asserts that this court has held that an examination by a "state doctor meets the requirements of Ake ." Ward reshashes the same arguments he made in Ward VI , where we recounted Ward's claims as follows:
[W]e turn to the facts of Ward's case. At the time of his 1997 sentencing, Ward must have made the threshold showing that his sanity at the time of the offense would be a significant issue and an error occurred in this court's review that requires us to recall the mandate in Ward III. The record demonstrates that on February 14, 1997, Ward filed a motion for appropriation of funds for expert assistance pursuant to Ake . In Ward's motion, he stated in pertinent part:
*550 Mr. Ward requests an ex parte hearing on this motion under the authority of Ake v. Oklahoma , 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985). This request is made because defense counsel does not wish to unnecessarily disclose the defense mitigation case.
The reasons in support of this motion are set out in the accompanying memorandum.
....
Counsel for Mr. Ward represents to the Court that she has probable cause to suspect that the utilization of these particular experts will produce mitigating evidence. It is the professional judgment of defense counsel that this information is necessary in order to adequately represent Mr. Ward and that these steps would most certainly be undertaken in the course of representation provided to a similarly situated client in a retained counsel case.
On February 27, 1997, the circuit court denied the Ake motion. At the pretrial hearing, Ward stated several times that he was not interested in resentencing and wanted to be released from prison or reinstate the death penalty. Additionally, Ward refused to cooperate in 1996 with the state hospital for a mental evaluation. On October 7, 1997, pursuant to both parties' request, the circuit court ordered Ward to undergo an Act III evaluation. On October 17, 1997, Michael Simon, Ph.D., a forensic psychologist, attempted to conduct an evaluation of Ward and submitted a report to the circuit court on that same date. The evaluation stated in pertinent part:
On 10/17/97, a forensic evaluation team consisting of Wendell Hall, MD., Michael I. Simon, PhD., and Maria Gergely, L.C.S.W. made an attempt to evaluate Mr. Ward. He was brought to a conference room to meet with the evaluation team at the Arkansas State Hospital. He was neatly dressed in an, orange jumpsuit. He began the interview by stating, "I cannot comply with the evaluation," He did say his attorneys filed a motion for evaluation and he tried to remove their motion. The court denied them and ordered him to appear for evaluation. He politely informed us "I am competent" ... "I have a right to remain silent," ... "I am not going to submit to evaluation." At this point the evaluation was terminated. Thus, in summary, the evaluation could not be completed due to Mr. Ward's unwillingness to participate. There was no evidence to indicate that this unwillingness was due to mental disease or defect. During our brief interview with Mr. Ward, he interacted in a logical, coherent manner and exhibited no signs of psychosis. Thus, in summary, Mr. Ward refused to cooperate with this evaluation and there was no indication that this uncooperativeness was due to any Axis I mental disorder.
At Ward's 1997 resentencing trial, Ward presented several witnesses through video-taped statements. Ward presented testimony of three educators from the Erie, Pennsylvania school system where he attended school. Thomas Ritter, a teacher and guidance counselor, testified that he taught Ward in 1965 and 1966 and was also his guidance counselor in the 1970s. Ritter testified that Ward did not have success in school and that Ward was disruptive, and without provocation was aggressive toward other students, but when Ritter spoke to Ward about this behavior he had a "blank stare ... there was no comprehension that he did anything wrong." Ritter further testified that he knew something "was basically wrong" with Ward but that he did not refer him to a psychologist *551 because at that time the school system had very limited access to psychologists and based on Ward's testing he had the ability to learn. Ritter also testified that Ward exhibited "hostile behavior ... bizarre behavior."
L. Catherine Fayenmeyer, a guidance counselor in Wattsburg, Pennsylvania from 1965 to 1975, testified that she met with Ward ten to twelve times over a five-year period and knew Ward well. She testified that Ward came to see her mainly for disciplinary problems. She further testified that Ward did not put forth effort in school and was disruptive in class. Fayenmeyer testified that Ward was very bright but had very few friends and did not engage in any activities at school. She testified that Ward was "exceptional" because he did not need classes for "dull students," but she opined that the opportunity to work one on one with a teacher would have made a significant difference for him.
C.J. Wortham, an education specialist in the City of Erie, Pennsylvania in the 1960s and 1970s and who was also part of the Civil Air Patrol Program, worked with Ward for approximately a year and a half when Ward was a cadet in the program. Wortham testified that Ward did well in the structured Civil Air Patrol program and was good with outdoor work and compassing. He also testified that Ward was good with adults, but had emotional problems dealing with his peers and life in general. Wortham testified that he recommended to Ward's family that they seek psychiatric help for Ward. He also testified that Ward got "into trouble" when alcohol was present.
Next, the deposition of Dr. Anthony Cillufo, a psychologist, was read into the record as part of Ward's 1997 sentencing. Dr. Cillufo testified that on April 22, 1977, he conducted a three-hour interview of Ward at the Erie County jail. He testified that he conducted a battery of tests and an extensive clinical interview with Ward, including talking with Ward about his life history, family relationships, and sexual history. Dr. Cillufo diagnosed Ward as an anxious, shy, alienated man of average intelligence, with a propensity for acting violently as part of a mixed personality disorder. He further testified that Ward had features of social personality or explosive personality as well as passive/aggressive and paranoid disorders, and a secondary diagnosis of alcoholism. Further, Dr. Cillufo testified that Ward could possibly have had some early history of minimal brain dysfunction and a slight possibility of neurological damage as Ward had reported fainting spells or blackouts. Dr. Cillufo testified that his main diagnosis was mixed personality disorder.
Ward also presented testimony from Tom Devine, an attorney at the Pulaski County Public Defender's Office. Devine testified that he had known Ward for twelve and a half years and Ward made paintings and drawings for him.
Gary Wayne Brossett had testified at Ward's first trial, and his testimony was also read into the record during Ward's 1997 sentencing. Brossett testified that he was a nursing student at Arkansas Children's Hospital in 1989 and was working at Joubert's, a local tavern. Brossett testified that Ward was at Joubert's on the night of Doss's murder and that Ward drank a few beers and played some pool and left the tavern around midnight.
Having reviewed Ward's presentation of evidence at the 1997 sentencing, we turn to Ward's argument in his motion to recall the mandate regarding an alleged Ake violation. In asserting that this court should recall the mandate on *552 this point, Ward relies primarily on a report from Dr. William Logan, a forensic psychiatrist. Logan's forty-one-page report regarding Ward's 1997 sentencing can be summarized as follows. Logan diagnosed Ward with "schizophrenia, paranoid type, as evidenced by a preoccupation with persecutory and grandiose delusional ideas, and occasional hallucinations and disorganized thinking." Dr. Logan examined Ward on October 22, 2008. Dr. Logan completed a three-hour examination on Ward at the Varner Supermax Unit. According to his report, Dr. Logan reviewed IQ evaluations performed on Ward in 1972, a presentence report performed in 1977, several documents compiled in connection with Ward's prior arrest in Pennsylvania in 1977, Ward's military records, a questionnaire completed by Ward's mother in 1977, Ward's medical history compiled after his 1989 arrest in Arkansas, evaluations performed by Dr. Simon, affidavits from Ward's prior counsel describing his behavior during his 1990 trial and two resentencing hearings, Ward's competency hearing, and various filings and pleadings made by both the State and Ward during his trial and sentencing hearings.
In his report, Dr. Logan described Ward as a heavyset man with poor grooming. He described Ward as having "fair thought organization when giving information about his family and childhood," but noted that "[a]s he began to discuss his legal situation his thought processes deteriorated markedly." Dr. Logan described Ward's "persistent and grandiose delusions" that he "was the target of a conspiracy between officials in Pennsylvania, someone he knew in Canton, Texas and various Arkansas government entities including the governor's office and the State and Federal Public Defenders." According to Dr. Logan, Ward's delusions "do not compromise his intellectual capacity in terms of his intelligence and orientation," but that his understanding of his conviction and sentence are "irrational and delusional." For example, Dr. Logan stated that Ward expressed his belief that "he will never be executed, but rather be exonerated and leave prison a free man to achieve great success." According to Dr. Logan, Ward attributes this belief to "revelations from God."
Dr. Logan's report also described delusions reported by Ward, including his belief that Joe Biden "got Nick Trenticosta (a former attorney of Mr. Ward's) on his case and also has a connection to his current attorney." Ward also reported that he "can see the future including future disasters and future events." He also believes his father is part of the Illuminati and that the Illuminati are trying to help him. According to Dr. Logan's report, Ward described visions of a large black dog that jumps into people and possesses them and that Ward reported hearing his deceased father's voice from a chair. Ward also described his belief that others are jealous of him because of his talent and power and that some of the other prisoners are demons under a spell from the State because they do not complain. Ward stated that he "also has been the victim of a laxative curse." During the interview, Ward reported that the "unholy Alliance in Pennsylvania told him to give up his powers or suffer the consequences."
Dr. Logan diagnosed Ward as having schizophrenia, paranoid type. Dr. Logan gave his opinion that Ward was not competent to be executed. Dr. Logan's specific report regarding the 1997 sentencing was as follows:
*553 Competency to Stand Trial in the 1997 Penalty Phase Hearing
Mr. Ward adamantly opposed any attempt by his then attorney, Ms. Tammy Harris to present mitigation testimony that might result in a life sentence. He resisted an effort to assess his competency. Mr. Ward's decisional competency was never addressed. He wanted an outright dismissal of the charges and compensation. Despite his bizarre behavior, the case was allowed to proceed. Subsequently, it has been revealed Mr. Ward's actions were the direct consequences of delusional beliefs that resulted from his Paranoid Schizophrenia, a mental disease.
Consequently, it is my opinion with a reasonable degree of medical certainty that at the 1997 Penalty Phase proceeding, Mr. Ward suffered from Paranoid Schizophrenia. It is my further opinion that the delusions characteristic of this mental disease prevented him from having an ability to understand rationally the proceedings against him and from having the ability to assist effectively in his own defense.
In reviewing Dr. Logan's report, we note that Dr. Logan's evaluation was performed in 2008 and was not part of the record in Ward's 1997 sentencing. Further, Dr. Logan's report discrediting years of data and evaluation is based on his one visit with Ward in 2008. In any event, Dr. Logan's report is of limited support for Ward's argument that a fundamental breakdown in the appellate process occurred in Ward's 1997 sentencing regarding Ward's Ake argument because it was not part of the record reviewed by this court.
Next, the record demonstrates that on October 17, 1997, Ward was afforded the opportunity to have his "competency and criminal responsibility" evaluated by psychologists at the state hospital. Although Ward was unwilling to participate, Dr. Simon reported that "there was no evidence to indicate that this unwillingness was due to mental disease or defect." Ward asserts that this evaluation is unreliable and he should be afforded an independent evaluation. However, we have recognized that a defendant's rights are adequately protected by an examination at the state hospital, an institution that has no part in the prosecution of criminals. Branscomb v. State , 299 Ark. 482, 774 S.W.2d 426 (1989) ; Dunn v. State , 291 Ark. 131, 722 S.W.2d 595 (1987) ; Wall v. State , 289 Ark. 570, 715 S.W.2d 208 (1986). In other words, the defendant does not have a constitutional right to search for a psychiatrist of his personal liking or to receive funds to hire his own but is entitled to access to a competent psychiatrist and the examination afforded to Ward satisfied that right. Although Ward requests that we overrule our precedent holding that a competency evaluation at the Arkansas State Hospital satisfies Ake , we decline to overrule this precedent.
In sum, we do not find merit in Ward's assertions. Whether Ward contends that he was not competent to stand trial at the 1997 sentencing or that his sanity at the time of the offense was at issue, based on the record before us, we do not find that there was a breakdown in the appellate process in Ward III. Ward was afforded his constitutionally guaranteed evaluation pursuant to Ake , and the record does not support Ward's contention that any breakdown occurred. Ward simply failed to make a threshold showing that his sanity at the time of the offense or his competence to stand trial were significant factors.
*554 While the record demonstrates that Ward filed the Ake motion, Ward did not make an argument that the state hospital evaluation was inadequate or present any evidence that would support his argument that there was a breakdown in the appellate process. Likewise, we reject Ward's contention that the circuit court's failure to provide an independent psychiatrist to develop mitigating evidence during sentencing, and this court's subsequent failure to discover and reverse that decision, resulted in a breakdown of the appellate process. Accordingly, we deny Ward's request that we recall the mandate on his first point.
Ward V , 2015 Ark. 61 at 7-15, 455 S.W.3d at 823-27.
In reviewing Ward's claims, we recognize that we addressed Ward's arguments in his current motion to recall the mandate regarding Ake and its requirements in Ward VI. Today, he continues to make the same arguments he made in 2015 when this court addressed those issues and denied the motion. "The doctrine of the law of the case provides that the 'decision of an appellate court establishes the law of the case for the trial upon remand and for the appellate court itself upon subsequent review.' Washington v. State , 278 Ark. 5, 7, 643 S.W.2d 255 (1982) (citing Mayo v. Ark. Valley Trust Co. , 137 Ark. 331, 209 S.W. 276 (1919) ). Although we noted in Washington that the doctrine is not inflexible and does not absolutely preclude correction of error, id. (citing Ferguson v. Green , 266 Ark. 556, 557, 587 S.W.2d 18 (1979) ), we have also held that the doctrine prevents an issue raised in a prior appeal from being raised in a subsequent appeal 'unless the evidence materially varies between the two appeals.' Fairchild v. Norris , 317 Ark. 166, 170, 876 S.W.2d 588 (1994). We adhere to this doctrine to preserve consistency and to avoid reconsideration of matters previously decided. Id. Significantly, the doctrine extends to issues of constitutional law. Id. ; Findley v. State , 307 Ark. 53, 818 S.W.2d 242 (1991)." Kemp v. State , 335 Ark. 139, 142-43, 983 S.W.2d 383, 385 (1998).
Here, there is neither an allegation for correction of an error nor of evidence that materially varies from Ward's prior motion to recall the mandate of his resentencing in Ward VI. Ward merely reargues the merits of his former challenges to this court's interpretation of Ake . We previously considered and rejected Ward's arguments. Accordingly, pursuant to the law-of-the-case doctrine, we hold that Ward's arguments provide no basis for granting Ward's motion to recall the mandate in his resentencing.
Further, as we explained in Ward VI , the United States Supreme Court in Ake held that when a defendant has made a preliminary showing that his sanity at the time of the offense is likely to be a significant factor at trial, due process requires that a state provide access to a psychiatrist's assistance on this issue, if a defendant cannot otherwise afford one. Ake , 470 U.S. at 74, 105 S.Ct. 1087. The Supreme Court held:
[W]hen a defendant demonstrates to the trial judge that his sanity at the time of the offense is to be a significant factor at trial, the State must, at a minimum, assure the defendant access to a competent psychiatrist who will conduct an appropriate examination and assist in evaluation, preparation, and presentation of the defense. This is not to say, of course, that the indigent defendant has a constitutional right to choose a psychiatrist of his personal liking or to receive funds to hire his own. Our concern is that the indigent defendant have access to a competent psychiatrist for the purpose we have discussed, and as in the *555 case of the provision of counsel we leave to the State the decision on how to implement this right.
Ake , 470 U.S. at 83, 105 S.Ct. 1087.
Pursuant to Ake , Ward must make a threshold showing that his sanity is likely to be a significant factor in his defense. This determination is made on a case by case basis. See Pyland v. State , 302 Ark. 444, 790 S.W.2d 178 (1990). In Ward VI , we held that Ward failed to meet this standard. Accordingly, based on our discussion above, we do not find merit in Ward's argument that this court has misinterpreted Ake .
Next, with regard to Ward's argument that McWilliams altered or expanded the standards required by Ake , this argument is without merit. In McWilliams , the Court did not alter or change the requirements of Ake . The United States Supreme Court held:
We turn to the main question before us: whether the Alabama Court of Criminal Appeals' determination that McWilliams got all the assistance that Ake requires was "contrary to, or involved an unreasonable application of, clearly established Federal law." 28 U.S.C. § 2254(d)(1).
McWilliams would have us answer "yes" on the ground that Ake clearly established that a State must provide an indigent defendant with a qualified mental health expert retained specifically for the defense team, not a neutral expert available to both parties. He points to language in Ake that seems to foresee that consequence. See, e.g., 470 U.S. at 81, 105 S.Ct. 1087 ("By organizing a defendant's mental history, examination results and behavior, and other information, interpreting it in light of their expertise, and then laying out their investigative and analytic process to the jury, the psychiatrists for each party enable the jury to make its most accurate determination of the truth on the issue before them" (emphasis added)).
We need not, and do not, decide, however, whether this particular McWilliams claim is correct. As discussed above, Ake clearly established that a defendant must receive the assistance of a mental health expert who is sufficiently available to the defense and independent from the prosecution to effectively "assist in evaluation, preparation, and presentation of the defense." Id. , at 83, 105 S.Ct. 1087. As a practical matter, the simplest way for a State to meet this standard may be to provide a qualified expert retained specifically for the defense team. This appears to be the approach that the overwhelming majority of jurisdictions have adopted. See Brief for National Association of Criminal Defense Lawyers et al. as Amici Curiae 8-35 (describing practice in capital-active jurisdictions); Tr. of Oral Arg. 40 (respondent conceding that "this issue really has been mooted over the last 30-some-odd years because of statutory changes"). It is not necessary, however, for us to decide whether the Constitution requires States to satisfy Ake 's demands in this way. That is because Alabama here did not meet even Ake 's most basic requirements.
The dissent calls our unwillingness to resolve the broader question whether Ake clearly established a right to an expert independent from the prosecution a "most unseemly maneuver." Post , at 1801-1802 (opinion of ALITO, J.). We do not agree. We recognize that we granted petitioner's first question presented-which addressed whether Ake clearly established a right to an independent expert-and not his second, which raised more case-specific concerns. See Pet. for Cert. i. Yet that does not bind us to *556 issue a sweeping ruling when a narrow one will do. As we explain below, our determination that Ake clearly established that a defendant must receive the assistance of a mental health expert who is sufficiently available to the defense and independent from the prosecution to effectively "assist in evaluation, preparation, and presentation of the defense," 470 U.S. at 83, 105 S.Ct. 1087 is sufficient to resolve the case. We therefore need not decide whether Ake clearly established more. (Nor do we agree with the dissent that our approach is "acutely unfair to Alabama" by not "giv[ing] the State a fair chance to respond." Post, at 1808. In fact, the State devoted an entire section of its merits brief to explaining why it thought that "[n]o matter how the Court resolves the [independent expert] question, the court of appeals correctly denied the habeas petition." Brief for Respondent 50. See also id., at 14, 52 (referring to the lower courts' case-specific determinations that McWilliams got all the assistance Ake requires).)
McWilliams , 137 S.Ct. 1790, 1799-801.
Simply put, McWilliams did not answer the question that Ward was relying on in seeking relief in this motion. McWilliams did not establish new law. In sum, this case is the same one he presented in Ward VI , and McWilliams does not develop new law or change the standard pursuant to Ake. Based on our review of the record and the discussion above, Ward has failed to meet the standard for this court to recall the mandate in his resentencing. Therefore, the motion is denied.
Motion denied; stay of execution lifted.[2]
Wood and Womack, JJ., concur.
Kemp, C.J., and Hart, J., dissent.

In Robbins , we recalled the mandate because (1) Robbins cited to a decision "on all fours legally" with the issue presented, (2) federal court proceedings had been dismissed because of an unexhausted state-court claim, and (3) it was a death-penalty case, which required heightened scrutiny. Robbins , 353 Ark. at 564, 114 S.W.3d at 222-23 In making that decision, we noted that there were unique circumstances that made the case "one of a kind, not to be repeated." Id. , 114 S.W.3d at 223.

Although we lift the stay of execution in this case, we note that in Ward v. Hutchinson , CV-17-291, on April 14, 2017, we entered a stay of execution.